[No. 30828. *En Banc.* December 4, 1948.]

THE STATE OF WASHINGTON, *on the Relation of Washington Toll Bridge Authority, Plaintiff*, v. CLIFF YELLE, *as State Auditor, Respondent.*[1]

[1]Reported in 200 P. (2d) 467.

14

*The Attorney General* and *Lyle L. Iversen, Assistant,* for relator.

*Lester T. Parker, Special Assistant Attorney General,* for respondent.

*Ryan, Askren & Mathewson* and *Laurance S. Carlson, amici curiae.*

STEINERT, J.—Relator, Washington toll bridge authority, filed in this court its application for an alternative writ of mandate directing the respondent, Cliff Yelle, state auditor, to execute certain bonds necessary for financing the establishment of a Puget Sound ferry and toll bridge system, or to show cause why he should not execute such bonds. The application was based upon the affidavit of J. Webster Hoover, secretary of Washington toll bridge authority, and upon certain written exhibits attached to and made a part of the affidavit. Upon the showing presented by the application, the chief justice issued an order directing the respondent to show cause why the writ should not issue. In response to the order, the respondent filed a demurrer to relator's application, on the ground that it did not state facts sufficient to entitle relator to any relief in the premises. At the same time, respondent filed an answer admitting all of the allegations contained in relator's affidavit and setting forth, as an affirmative defense, his reasons for not executing the bonds. Upon these pleadings, the cause was argued and submitted to this court for decision.

There is no dispute concerning the facts as set forth in the pleadings and amplified by the exhibits attached thereto.

The Washington toll bridge authority, consisting of five state officials, was created by chapter 173, p. 654, Laws of 1937 (Rem. Rev. Stat., Vol. 7A, § 6524-1 [P.P.C. § 632-1] *et seq.*) The title to that act reads as follows:

"AN ACT *relating to toll bridges*; creating the Washington Toll Bridge Authority and providing for certain officers as

members thereof; relating to the powers and duties of the Washington Toll Bridge Authority and certain officers; providing for the investigation, examination, survey, recognizance [reconnaissance], *construction and operation of toll bridges;* providing for the examination, survey, reconnaissance, *construction and operation of toll tunnels;* providing for the acquisition of property for *toll tunnels, their approaches, and establishment;* providing for the issuance and sale of bonds and the conditions, terms and redemption thereof; providing for the deposit and use of certain funds and revenues; defining terms; repealing acts and parts of acts in conflict; providing for constitutionality; and declaring an emergency." (Italics ours.)

Section 3 of the act (Rem. Rev. Stat., Vol. 7A, § 6524-3), provides in part:

"The Washington Toll Bridge Authority is empowered, in accordance with the provisions of this act, *to provide for the establishing and constructing of toll bridges upon any public highways of this state together with approaches thereto* wherever the same is considered necessary or advantageous and practicable for crossing any stream, body of water, gulch, navigable water, swamp or other topographical formation whether the same is within this state or constitutes a boundary between this state and an adjoining state or country. The necessity or advantage and practicability of any such *toll bridge* shall be determined by the Washington Toll Bridge Authority and the feasibility of financing any *toll bridge* in the manner provided by this act shall be a primary consideration and determined according to the best judgment of the Washington Toll Bridge Authority. . . ." (Italics ours.)

Section 3½ of the act (Rem. Rev. Stat., Vol. 7A, § 6524-3½) provides in part:

"The Washington Toll Bridge Authority is hereby empowered *to provide for the establishment, construction and operation of toll tunnels* and other facilities necessary for their construction and *connection with public highways of this state.* . . ." (Italics ours.)

Section 6 (Rem. Rev. Stat., Vol. 7A, § 6524-6) provides that if the Washington toll bridge authority determines to construct any *toll bridge or toll bridges,* it shall pass a resolution authorizing the issuance of revenue bonds in an

amount *not in excess of that estimated to be required for such construction.*

Section 7 (Rem. Rev. Stat., Vol 7A, § 6524-7) provides that any and all bonds issued for the construction of *any toll bridge or toll bridges* shall be a direct lien and charge upon the tolls and revenues derived from the operation of the particular *toll bridge or toll bridges,* for the construction of which the bonds are issued.

Section 14 (Rem. Rev. Stat., Vol. 7A, § 6524-14) provides that the proceeds of such bonds shall be paid out or disbursed solely for the *construction of such toll bridge or toll bridges for which the bonds were issued and sold.*

Reference to and quotation from these several portions and sections of chapter 173, Laws of 1937, have hereinabove been made for the explicit purpose of drawing attention to the fact that the 1937 act relates solely to *toll bridges and toll tunnels,* and that under that act the powers and duties of the Washington toll bridge authority are limited to those matters and things which are involved in and necessary for the *construction and operation of toll bridges and toll tunnels,* together with their approaches, *upon or in connection with the public highways of this state.*

It is also apparent, from what has been set forth above, that the 1937 act did not contemplate nor make the slightest reference to *ferries* or to the acquisition and operation thereof. For that matter, the legislative act did not even confer upon the toll bridge authority the power to *purchase* toll bridges or toll tunnels, but only the power to *construct* and operate them. All of the sections of the 1937 act, sixteen in number, bear out the statements just made, and, in fact, there is no contention to the contrary.

The validity of the 1937 act was tested and upheld in *State ex rel. Washington Toll Bridge Authority v. Yelle,* 195 Wash. 636, 82 P. (2d) 120, and *State ex rel. Washington Toll Bridge Authority v. Yelle,* 197 Wash. 110, 84 P. (2d) 688, wherein the construction of the "Narrows Bridge" in Pierce county and that of the "Lake Washington Toll Bridge" in King county, respectively, were involved.

Late in 1940, the Narrows Bridge collapsed, and, in the following session of the legislature, chapter 9, p. 22, Laws of 1941 (Rem. Supp. 1941, § 6524-3b *et seq.*), was passed, as an emergency measure, ratifying all of the acts of the *department of highways* done in connection with the operation and maintenance of a ferry service at the Narrows Bridge subsequent to its collapse, and authorizing the continuance of such service.

In 1945, the legislature enacted chapter 266, p. 858, Laws of 1945 (Rem. Supp. 1945, § 6524-3a). This is the act upon which the relator herein relies in support of its petition for a writ of mandate. The 1945 act originated as House Bill No. 343 and was introduced in the House of Representatives on February 14th of that year. (House Journal, p. 255). The title of the original bill related solely to toll bridges, and the body of the bill simply authorized the Washington toll bridge authority "to acquire by purchase and to operate and finance such toll bridges upon, or connecting with, any highway, together with approaches thereto"; whereas, the 1937 act had previously authorized the toll bridge authority only to *construct* and operate toll bridges and toll tunnels. House Bill No. 343 was amended, however, on the floor of the House on February 27, 1945 (House Journal, pp. 451-452), and, when finally passed on March 7th, became chapter 266, p. 858, Laws of 1945. The title of the act as thus finally passed reads as follows:

"AN ACT *relating to toll bridges;* relating to the powers and duties of the Washington Toll Bridge Authority and certain officers; authorizing the purchase and operation *of toll bridges, highway and ferry connections and approaches thereto;* providing for issuance and sale of bonds and the conditions, terms and redemption thereof; providing for the deposit and use of certain funds and revenues; and amending chapter 173, Laws of 1937, by adding a new section thereto to be known as section 3A." (Italics ours.)

The 1945 act, consisting of a single section with several subdivisions, provides in part:

"Section 1. Chapter 173, Laws of 1937, is amended by adding thereto a new section following section 3, to be designated section 3A, which shall read as follows:

"Section 3A. (a) The Washington Toll Bridge Authority, whenever it is considered necessary or advantageous and practicable, is empowered to provide for the acquisition by *purchase* of, and to *acquire by purchase,* (1) any bridge or bridges or *ferries which connect with or may be connected with the public highways of this state,* and (2) together with approaches thereto. . . . " (Italics ours.)

It will be noted that the title to the 1945 act as finally passed designates the act as one relating to toll bridges and to the powers and duties of the Washington toll bridge authority, and then refers to "toll bridges" and "ferry connections" as though these were structures connected with each other; whereas the body of the act refers to bridges or *ferries,* in the disjunctive and as though there was no necessary connection between them. It will also be noted that the 1945 act contains the first expression of any attempt or intention on the part of the legislature to empower the Washington toll bridge authority to purchase, construct, or operate ferries or ferry connections.

The portion of that act upon which relator herein places greatest reliance is subd. (b) of § 3A. That subdivision provides that, in connection with the acquisition, *by purchase,* of any bridges or *ferries,* or in *purchasing,* operating, financing, and maintaining either of them, the toll bridge authority is empowered and required to do all the things required to be done under the 1937 act, and shall officiate in the same manner and according to the same procedure as provided by that act, for establishing, *constructing,* operating, financing, and maintaining *toll bridges,* in so far as such powers and requirements and such manner and procedure are applicable to the *purchase* and operation of any bridges or *ferries.* Further reference to this subdivision of the 1945 act will be made later herein.

What has thus far been related, constitutes the statutory authorization upon which the validity of the steps recently taken by the Washington toll bridge authority to acquire and operate an extensive system of water transportation upon and across Puget Sound must depend.

We shall next review the procedure followed by the toll bridge authority in its endeavor to accomplish that objective.

On November 4, 1948, the toll bridge authority, through its proper officers, adopted a resolution, consisting of thirty-five printed pages, entitled:

"A RESOLUTION providing for acquisition, ownership and operation of a system of transportation for Puget Sound consisting of ferries and a toll bridge and in that connection authorizing and providing for the issuance of Puget Sound Toll Bridge and Ferry Revenue Bonds by Washington Toll Bridge Authority; setting forth the terms and conditions upon which said bonds and additional bonds are to be and may be issued and outstanding, providing for the payment of said bonds and interest thereon, designating a trustee, and providing for the rights of the holders of said bonds in the enforcement thereof."

The plan envisaged by this resolution includes the intended purchase from Puget Sound Navigation Company of twelve steel ferries and nine wooden ferries, together with certain lands, wharves, docks, motor equipment, office supplies, and ship stores, for the total sum of $5,975,000; the purchase of ferries and facilities owned by Olympic Navigation Company, now furnishing service across Hood Canal, for the sum of $60,000; the purchase of a ferry, operated by King County Ferry District No. 1, for the sum of $45,000; the construction of a toll bridge across Agate Pass, thereby connecting Bainbridge Island with the mainland of the Olympic peninsula, at a cost of $1,398,439; the rehabilitation of the ferries to be purchased under the plan; and the construction of additional wharves, docks, and terminal facilities for the operation of ferries. The resolution further provides that all of these facilities, to be purchased or constructed pursuant to this plan, shall constitute and be referred to as a transportation system for Puget Sound.

Under the terms of the resolution, the entire project would be financed from a single bond issue in the sum of $10,500,000, for which the toll bridge authority has recently received a bid of $10,027,500. The bonds are to be

dated October 1, 1948, will mature October 1, 1968, and are to be repayable from, and be secured by a first and exclusive lien upon, the tolls and other revenues received from the operation of the Puget Sound Transportation System. The bonds are to be the obligations of only the Washington toll bridge authority, and neither the principal thereof nor the interest thereon shall constitute a debt, liability, or obligation of the state of Washington.

Under the bond indenture, the toll bridge authority covenants that the transportation system shall be continuously operated as a revenue-producing undertaking; further, that a schedule of tolls for transit over the system shall be fixed, and from time to time revised, so that the tolls and revenues therefrom will be sufficient at all times to defray the costs of operation and maintenance, to pay promptly the interest and the annual installments of principal of the bonds, and to establish and maintain an improvement fund for the purpose of extending, replacing, and improving such system of transportation.

The resolution in addition provides that, from the proceeds of the bond issue, the sum of $210,000 shall be set aside to pay interest on the bonds during the period of construction and for six months thereafter. The balance of the purchase price of the bonds is to be deposited into a fund designated "Puget Sound Transportation System Construction Fund," to be used and paid out as follows:

(a) To purchase the ferries and other properties above mentioned;

(b) To pay a sum, not in excess of $250,000, into a fund designated "Puget Sound Transportation System Operating Fund," for operation and maintenance purposes;

(c) To pay certain expenses connected with the issuance of the bonds, and for initial insurance premiums, etc.

(d) "The balance of moneys in the said 'Construction Fund' shall be paid out solely to provide for the reconstruction and rehabilitation of the ferries, wharves, docks, landings and terminal facilities, *the construction of new or additional wharves, docks, landings and terminal facilities,* the construction of the toll bridge across Agate Pass from

Bainbridge Island northwesterly to the mainland, including approaches thereto; together with all reasonable incidental expenses in connection with all of the foregoing including but not limited to architectural and engineering services and right of way." (Italics ours.)

The resolution also provides for a trust fund, to be designated as "Puget Sound Transportation System Improvement Fund," which fund is to be created and maintained by annual payments out of the income of the proposed transportation system in progressively increasing amounts ranging from $150,000 in 1949 up to $500,000 in 1968. Moneys are to be withdrawn from this improvement fund and used

". . . for the purpose of paying all or any part of the cost of constructing, purchasing, reconstructing, replacing, extending, bettering, developing, or otherwise improving any part of the system, including new or additional toll bridges, ferries, wharves, docks and landings."

Pursuant to the adoption of the foregoing resolution, the Washington toll bridge authority prepared a form of bond to be executed by the proper officers. The state auditor, respondent herein, who by law is required to sign all bonds issued by the toll bridge authority, declined to execute the bond, or bonds, for the following expressed reasons:

"(a) The title to Chapter 266, Laws of 1945 [quoted above], is not sufficiently broad to authorize the acquisition and operation of ferries and a ferry system upon Puget Sound.

"(b) Chapter 173 of the Laws of 1937 [portions of which have been quoted or otherwise referred to above] as amended by Chapter 266 of the Laws of 1945 does not authorize purchase of ferries and the construction of a toll bridge under one issue of bonds whereby the tolls and revenues derived from operation of the ferries and the toll bridge are to be applied to the bonded indebtedness created by the one issue.

"(c) Funds to be derived through the sale of the bonds under the above-mentioned laws may not be used for construction, reconstruction and rehabilitation of wharves, docks and landing facilities and the reconstruction of ferries.

"(d) The above-mentioned Chapter 173, Laws of 1937, as amended by Chapter 266, Laws of 1945, contains no authority whereunder the tolls and revenues derived from the operation of ferries and a toll bridge may be used in part for an improvement fund to maintain and improve ferries and ferry facilities as provided by the resolution authorizing the issuance of the bonds."

This proceeding was thereupon instituted by the relator for the purpose of procuring a writ of mandate ordering the state auditor to execute the bonds which have been, or will be, submitted to him for that purpose. Inasmuch as the writ can issue only in the event that the proposed bonds are valid, the case must turn on our determination of the question of their legal sufficiency.

The first question presented in the briefs of the parties, and one which they recognize as being a crucial subject of inquiry, is whether chapter 266, Laws of 1945 (Rem. Supp. 1945, § 6524-3a), quoted above, is violative of Art. II, § 19, of the Washington constitution, which provides: "No bill shall embrace more than one subject, and that shall be expressed in the title."

It is to be noted that this constitutional provision contains not merely one prohibition or direction to the legislature, but two, viz: (1) No bill shall embrace more than one subject; and (2) the subject of every bill shall be expressed in the title.

In order to determine whether the legislative act here under scrutiny is violative of this constitutional provision, it becomes necessary not only to examine the *body* of the bill with the view of discovering whether it does in fact embrace more than one subject, but also is it necessary to examine the *title* of the bill and determine therefrom whether it expresses the subject of the bill proper, whatever that subject can most fairly be said to be. More specifically, the dual question thus posed is: (1) whether the term "bridges or ferries," as used in the body of the legislative act, connotes one subject or two subjects, when tested by the mandate of Art. II, § 19; and (2) if but one subject is embraced, and if it can fairly be said that this

single subject was intended to include the operation of a system of ferry transportation, whether that subject is sufficiently or adequately expressed in the title of the act by the use of the words "ferry connections."

Preparatory to the consideration of these questions, we shall refer to several principles and rules recognized by this court with respect to this provision of the constitution. ■ The purposes of this constitutional mandate are threefold: (1) to protect and enlighten the members of the legislature against provisions in bills of which the titles give no intimation; (2) to apprise the people, through such publication of legislative proceedings as is usually made, concerning the subjects of legislation that are being considered; and (3) to prevent hodge-podge or log-rolling legislation. We have declared that when laws are enacted in violation of this constitutional mandate, the courts will not hesitate to declare them void.

In *State ex rel. Potter v. King County*, 49 Wash. 619, 96 Pac. 156, this principle is forcefully expressed as follows:

"The constitutional provision, § 19, art. 2, which provides that no bill shall embrace more than one subject and that shall be expressed in the title, was incorporated in the constitution for a beneficial purpose, viz., for the protection and enlightenment of the members of the legislature and for notice to citizens at large of proposed legislation which they might desire by proper methods to encourage or defeat; and when laws are enacted or amended in substantial violation of this guaranty, the taint of at least suspicion of unfairness is upon them, and courts should not hesitate to declare them void."

In *State ex rel. Arnold v. Mitchell*, 55 Wash. 513, 104 Pac. 791, this court voiced its understanding and interpretation of this provision of the constitution in the following expression:

"In it the people have found their most potent weapon against vicious legislation. It is a declaration that truth must go before, shedding its light upon every legislative act. It makes the title speak the object of the law. A wholesome statute, if declaratory of a subject not within the title, must fall before it, for it is general in its application. While it is intended as a guard against the bad in legislation, it

is also intended as a herald of the true intent and purpose of the law. It is not within the power of the courts to declare a law which is passed in contravention of this mandate wholesome because it is so. If this power were exercised, it would result in a direct violation of the constitutional mandate and a usurpation of the functions of the legislature on the part of the courts. Laws would be sustained or defeated by considerations of present policy rather than by reference to the constitution."

In *Petroleum Lease Properties Co. v. Huse*, 195 Wash. 254, 80 P. (2d) 774, we quoted from 1 Cooley's Constitutional Limitations (8th ed.) 296, wherein the object of this constitutional limitation was stated to be:

" ' . . . *first* to prevent *hodge-podge* or "log-rolling" legislation; *second,* to prevent surprise or fraud upon the legislature by means of provisions in bills of which the titles gave no intimation, and which might therefore be overlooked and carelessly and unintentionally adopted; and, *third,* to fairly apprise the people, through such publication of legislative proceedings as is usually made, of the subjects of legislation that are being considered, in order that they may have opportunity of being heard thereon, by petition or otherwise, if they shall so desire.' "

In the recent case of *Swedish Hospital v. Department of Labor & Industries*, 26 Wn. (2d) 819, 176 P. (2d) 429, appears this statement:

"This provision, or its equivalent, is found in all, or nearly all, state constitutions, and it has been discussed in a wilderness of decisions, including a great many of our own. It is universally agreed that one of the principal objects of this constitutional provision is to fairly apprise the people, through such publication of legislative proceedings as is usually had, of the bills being considered, to the end that persons or institutions affected by such bills may have an opportunity of being heard thereon, by petition or otherwise, if they so desire. Such publication is usually, if not almost universally, made by publishing the titles."

Another rule which has been frequently stated by this court is that the title of an act need not be an index to the contents of the legislation that follows, nor need it express in detail every phase of the subject which is dealt

with by the enactment, but that it is sufficient if the title gives such notice as should reasonably lead to an inquiry into the body of the act itself, or indicates, to an inquiring mind, the scope and purpose of the law. *State ex rel. Zent v. Nichols*, 50 Wash. 508, 97 Pac. 728; *Sorenson v. Kittitas Reclamation Dist.*, 70 Wash. 528, 127 Pac. 102; *State v. Asotin County*, 79 Wash. 634, 140 Pac. 914; *Maxwell v. Lancaster*, 81 Wash. 602, 143 Pac. 157; *State v. Hennessy*, 114 Wash. 351, 195 Pac. 211; *Shea v. Olson*, 185 Wash. 143, 53 P. (2d) 615, 111 A. L. R. 998; *State ex rel. Port of Seattle v. Department of Public Service*, 1 Wn. (2d) 102, 95 P. (2d) 1007; *DeCano v. State*, 7 Wn. (2d) 613, 110 P. (2d) 627; *Cory v. Nethery*, 19 Wn. (2d) 326, 142 P. (2d) 488.

█ In applying this latter rule, however, there is a distinction between the effect of a broad, general title and that of a narrow, restricted one. If the title is general and comprehensive, it will be given a liberal construction; in such case, no elaborate statement of the subject of the act is necessary, and a few well-chosen words suggestive of the general subject treated is all that is required. If, however, the title is a restricted one, it will not be regarded so liberally, and provisions which are not fairly within such restricted title will not be given force. *In re Peterson's Estate*, 182 Wash. 29, 45 P. (2d) 45; *Petroleum Lease Properties Co. v. Huse, supra; DeCano v. State, supra; Cory v. Nethery, supra.*

In the *DeCano* case, *supra*, this court made the following statement, based on the authorities therein analyzed:

"In this connection, it should be noted that, in applying the general rules in question, this court has observed a well-marked line of distinction between broad, general titles on the one hand and narrow, restricted titles on the other. The legislature may, if it chooses, adopt a very broad and comprehensive title in a bill, in which case great liberality will be indulged to hold that any subject reasonably germane to such title may be embraced within the body of the bill. If, however, the legislature sees fit to use a restricted title, in which the language is of specific, rather than generic, import, the title will not be regarded so liberally, and provisions of the bill not fairly embraced therein cannot be given force."

This same quotation is set forth in *Cory v. Nethery, supra.*

Referring, now, to the *title* of the 1945 act, we note that it does not employ any such broad, general term as "transportation system," but deals only with the specific subject of toll bridges and, at most, highway and ferry connections and approaches thereto. We note, further, that the *body* of the 1945 act likewise does not deal with any broad subject such as "transportation system," but simply with the narrow, limited subjects of toll bridges and ferries.

It is true that the resolution recently adopted by the Washington toll bridge authority continuously uses the term "transportation system" and that, by the express recitals therein, the toll bridge authority endeavors to tie together into one operation the proposed toll bridge over Agate Pass and the various ferries which it proposes to purchase and operate, and, by this combination, to create a transportation system over and across Puget Sound. However, the fact remains that the 1945 act itself does not relate to, nor make any mention of, a "transportation system," that phrase appearing neither in the title of the act nor in its body.

■ We are of the opinion that the body of the 1945 act embraces more than one subject, *viz.*, toll bridges and ferries, and that, when the act is read as a whole, it cannot fairly be said that it embraces but a single subject or that its dual subject comprehends any such broad appellation as "transportation system." This conclusion is strengthened, we think, by the fact that the 1937 act (chapter 173, Laws of 1937, quoted and referred to above) in no way relates or refers to ferries, but confines itself to toll bridges, toll tunnels, and approaches thereto; in other words, the 1945 act, while purporting, both in its title and in its body, merely to amend the 1937 act by adding a new section thereto, in fact introduced an entirely new and additional subject when it brought in the matter of ferries.

■ We are further of the opinion that the term "ferry connections," as used in the title of the 1945 act, is not sufficient to put a reasonably intelligent person on notice that the powers of the Washington toll bridge authority have

purportedly become so enlarged, beyond the limited powers which it formerly possessed under the 1937 act, that it can now acquire and operate a general water transportation system of the magnitude outlined in its recent resolution.

The next question to be considered is respondent's contention that chapter 266, Laws of 1945, violates Art. II, § 37, of the state constitution, which provides:

"No act shall ever be revised or amended by mere reference to its title, but the act revised or the section amended shall be set forth at full length."

It will be recalled, from what has heretofore been stated, that the 1945 act, consisting of a single section, broken down into several subdivisions, simply provides that chapter 173, Laws of 1937, is amended by adding thereto a new section to be designated section 3A. The 1945 act does not purport to set forth at full length the act revised, i.e., the 1937 act.

Respondent does not contend that the 1945 act merely refers to the *title* of the 1937 act, but does contend that the body of the earlier act could not be amended, as it is argued was accomplished in this instance, by simply referring to it in the later act as being amended by the addition of a new section, without at the same time setting forth at full length the revised or amended portion of the 1937 act.

It is generally recognized that certain types of enactments, designated by the courts as "reference statutes," are not within the restrictions contemplated by Art. II, § 37, of the constitution. *State v. Rasmussen*, 14 Wn. (2d) 397, 128 P. (2d) 318; 50 Am. Jur. 195, Statutes, § 215.

Reference statutes are those statutes which refer to, and by reference adopt wholly or partially, pre-existing statutes, or which refer to other statutes and make them applicable to an existing subject of legislation. 36 Words & Phrases (Perm. ed.) 618.

In *State v. Rasmussen, supra,* the purpose, use, and effect of such statutes are described in language quoted from 25 R.C.L. 907, § 160, as follows:

" 'Statutes which refer to other statutes and make them applicable to the subject of the legislation are called "reference statutes." Their object is to incorporate into the act of which they are a part the provisions of other statutes by reference and adoption. Reference statutes are of frequent use to avoid encumbering the statute books by unnecessary repetition, and they have frequently been recognized as an approved method of legislation, in the absence of constitutional restrictions. . . . When in one statute a reference is made to an existing law, in prescribing the rule or manner in which a particular thing shall be done, or for the purpose of ascertaining powers with which persons named in the referring statute shall be clothed, the effect generally is not to revive or continue in force the statute referred to for the purposes for which it was originally enacted, but merely for the purpose of carrying into execution the statute in which the reference is made.' "

See, also, 50 Am. Jur. 57, 58, Statutes, §§ 36, 37, 38; Notes (1930), 67 A. L. R. 564 *et seq.*

In *Pacific First Federal Sav. & Loan Ass'n v. Pierce County*, 27 Wn. (2d) 347, 178 P. (2d) 351, this court said, with reference to such statutes:

"Courts are unanimous concerning the primary legal effect of the statutory reference whenever an act of the legislature brings into itself, by reference, the terms of another act. The precepts and terms to which reference is made are to be considered and treated as if they were incorporated into, and made a part of the referring act, just as completely as if they had been explicitly written therein. [Citing cases.]"

Under the definitions above given, we are of the opinion that the 1945 statute comes within the category of a reference statute and hence is not, in form, obnoxious to the constitutional provision.

It then becomes necessary to scrutinize the language of the 1945 enactment to determine the scope and effect of its incorporation, by reference, of the terms of the 1937 act. For purposes of convenient reference, and because relator places its greatest reliance upon a part of subd. (b) of § 3A of the act, we shall here set forth the exact language of that portion of the enactment:

"(b)  In connection with the acquisition by purchase of any bridge or bridges or ferries pursuant to the provisions of subsection (a) of this section, the Washington Toll Bridge Authority, the Director of Highways, the State Treasurer, the State Auditor, any city, county or other political subdivision of this state, and all said officers —

"(1)  are empowered and required to do all acts and things *as in this act provided for the* establishing and *constructing of toll bridges* and operating, financing and maintaining such bridges *in so far as such powers and requirements are applicable to the purchase of any* bridge or bridges or *ferries* and their operation, financing and maintenance; and

"(2)  *in purchasing,* operating, financing and maintaining any bridge or bridges or *ferries acquired or to be acquired by purchase* pursuant to the provisions of this section, *shall act in the same manner and under the same procedures as are provided in this act for* the establishing, *constructing,* operating, financing and maintaining *of toll bridges in so far as such manner and procedure are applicable to the purchase of any* bridge or bridges or *ferries* and their operation, financing and maintenance." (Italics ours.)

It is a principal contention of relator, repeatedly asserted throughout its brief, that the language of the 1945 act, above quoted, has made applicable, to the matter of purchasing ferries, all of the provisions theretofore applicable to toll bridges; and that all of the powers, procedures, and authorities heretofore enumerated, which the Washington toll bridge authority may exercise under and by virtue of the 1937 act, relating to toll bridges, may likewise be exercised by it with respect to the acquisition of ferries and the operation of a water transportation system, in the manner and to the extent provided for in its recently adopted resolution.

When the language of the 1945 act, above quoted, is carefully examined, it will be seen that it does not make the powers and duties vested in, or imposed upon, the toll bridge authority, in relation to *toll bridges,* applicable to ferries.  What the quoted language says is simply that, in relation to *ferries,* the toll bridge authority is empowered and required to do those acts and things which it is empowered and required to do with respect to *toll bridges,*

*in so far as such powers and requirements are applicable to the purchase of ferries.* In other words, the 1945 act does not expressly declare that the toll bridge authority may exercise the same powers, in the purchase and operation of ferries, as it was authorized to exercise under the 1937 act, with respect to toll bridges; nor does the 1945 act say that the powers and requirements with respect to toll bridges *shall be applicable* to the purchase and operation of ferries. The 1937 act says nothing and provides nothing with respect to the purchase or operation of *ferries,* but speaks only of toll bridges and tunnels. Consequently, there is nothing in that act that can be said to be *applicable* to the purchase or operation of *ferries.* It is our opinion that, even though the 1945 act may be considered to be a reference statute, it does not make the provisions of the 1937 act, pertaining to toll bridges, applicable to the acquisition and operation of ferries.

While several other objections to the issuance of the writ of mandate are argued by the respondent, we shall consider but one of them, without discussing or committing ourselves upon the others. That one remaining question is this: Does chapter 173, Laws of 1937, as amended by chapter 266, Laws of 1945, grant authority to the relator to create an improvement fund (Puget Sound Transportation System Improvement Fund), by diverting into such fund a portion of the tolls collected from the prospective Puget Sound Transportation System, and thereafter to use such diverted funds for the purpose of paying all, or any part, of the cost of

" . . . . constructing, purchasing, reconstructing, replacing, extending, bettering, developing, or otherwise improving any part of the system, *including new or additional toll bridges, ferries, wharves, docks and landings.* . . ." (italics ours),

as set forth in relator's resolution?

It is apparent, from a reading of the resolution, that the relator proposes not only to create an expansive system of transportation on and over Puget Sound, consisting initially of a fleet of ferries and one toll bridge, but that it

also plans to pool the operations of many disconnected ferry lines, together with a single toll bridge, and to create a 'fund by the withdrawal of a portion of the combined bridge and ferry tolls, received under this system, for the acquisition, by purchase or construction, of new or additional toll bridges, ferries, wharves, docks, and landings.

Chapter 266, Laws of 1945, on which relator relies, makes no reference to bonds, tolls, or other revenues. The provisions with respect to those matters are to be found only in chapter 173, Laws of 1937, relating to toll bridges. But a reading of the 1937 act reveals that it deals and is concerned only with the construction, financing, and operation of individual toll bridges and toll tunnels, not with an expanding system of water transportation by means of ferries.

For instance, § 9 of the 1937 act, which empowers the toll bridge authority to fix rates and charges for all *toll bridges* built under the act, provides in part:

"The tolls and charges shall be at all times fixed at rates to yield annual revenue equal to annual operating and maintenance expenses including insurance costs and all redemption payments and interest charges of the bonds issued *for any particular toll bridge or toll bridges* as the same become due and the bond redemption and interest payments shall constitute a first direct and exclusive charge and lien *on all such tolls* and other revenues and interest thereon and sinking funds created therefrom received from the use and operation of *said toll bridge or toll bridges.* . . ." (Italics ours.)

Again, § 12 of the 1937 act provides in part as follows:

"After all bonds issued hereunder for the construction of any toll bridge or toll bridges have been fully redeemed and paid the Washington Toll Bridge Authority may continue to collect tolls and other revenues *for the use of such toll bridge or toll bridges for the purpose of defraying all costs of operation and maintenance thereof, for the purpose of reimbursing the State of Washington for any expenditures which may have been made by it in connection with said toll bridge or bridges and for the purpose of repayment to any city, county, or other political subdivision of the state of any amount the Washington Toll Bridge Authority*

*shall have agreed to repay for money, rights of way, labor, materials or other property advanced or contributed for the construction of any such toll bridge or toll bridges."* (Italics ours.)

Section 14 of the act provides, *inter alia*, that the proceeds from the sale of all bonds authorized under the act shall be deposited in a trust fund set up to finance the *particular toll bridge or toll bridges for which such bonds were issued and sold;* and, further, that all tolls or other revenues received from the operation of any toll bridge or toll bridges, constructed with the proceeds of bonds issued and sold under the act, shall be deposited in a trust fund *for the particular toll bridge or toll bridges producing such tolls or revenues.*

Other sections of the 1937 act express the same purposes and limitations.

None of these sections have been changed by amendment, and hence the proceeds derived from the sale of bonds issued for the construction of a particular bridge or bridges, and the tolls received from the operation of such bridges, cannot be used to finance the construction of another bridge or combination of bridges.

From this fact it must necessarily follow that it is likewise not possible to glean from the 1937 act any color of authority for using the tolls and other revenues to be derived from the operation of certain ferry lines to finance and support the acquisition of other lines together with their accompanying facilities.

For the reasons hereinabove stated, we hold that, inasmuch as the relator's intended system of transportation for Puget Sound is not authorized under the statutory provisions of this state, the bonds proposed to be executed and issued to finance such transportation system are incapable of becoming valid obligations.

The application for writ of mandate to compel the state auditor to execute these bonds is denied.

BEALS, SIMPSON, SCHWELLENBACH, and HILL, JJ., concur.

MALLERY, C. J., dissents.

ROBINSON, J. (dissenting)—I cannot concur in the foregoing opinion and decision. I will forego making a detailed statement of my reasons for so doing; for so many of the members of the court have approved the opinion that it is evident that no single judge could possibly hope or expect to overturn the result at which they have arrived, and an argumentative dissent would, therefore, amount to nothing more than a record of the writer's personal views which would be of no value or use to anyone.

. Furthermore, the frequent publication of purely personal views in the form of dissenting opinions, is one of the reasons why the members of the bar and both public and private libraries are finding it increasingly difficult to purchase and properly house the voluminous reports of the American appellate courts.

JEFFERS and MILLARD, JJ., did not participate.