FILED
COURT OF APPEALS
DIVISION II

2014 APR 29 AM 8: 41

STATE OF WASHINGTON
BY_____
DEPUTY

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

# DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 43075-4-II |
| Respondent, | |
| v. | |
| TONYA NADINE QUINATA, | UNPUBLISHED OPINION |
| Appellant. | |

JOHANSON, J. — Tonya Nadine Quinata appeals her jury trial conviction for first degree assault. She argues that (1) the first degree assault statute is unconstitutional because it was enacted in violation of Wash. Const. art. II, § 19; (2) the trial court erred in admitting "testimonial hearsay" in violation of her U.S. Const. amends. VI and XIV right to confront witnesses; (3) the trial court erred in admitting the same hearsay statement under the medical treatment and diagnosis exception to the hearsay rule; and (4) the State engaged in prosecutorial misconduct in closing argument. Because the 1997 amendment to the first degree assault statute cured any potential art. II, § 19 defect, any potential confrontation clause or hearsay error was not prejudicial, and the prosecutor's remarks in closing argument either were not improper or were or could have been cured by proper jury instructions, we affirm.

FACTS

I. THE STABBING

On October 14, 2010, Quinata called 911 and reported that her live-in boyfriend, Samuel Kama, had stabbed himself in an attempted suicide.[1] During the call, Quinata told the 911 dispatcher that Kama was "trying to say [Quinata was] the one that did .it." 2 Report of Proceedings (RP) at 347.

When the paramedics and police arrived, Quinata was waiting for them outside. She told one of the paramedics that Kama had a knife wound, but she then "became distraught and was unable to relay any information to the [ambulance] crew." 1A RP at 64.

When the police and paramedics entered the home, Kama was on his back in a hallway. He had blood on his shirt and the paramedics found a stab wound in his chest that was about one-half to three-quarters of an inch wide. On the way to the hospital, Kama told one of the paramedics that he did not stab himself, but according to the paramedic, Kama was unable to relay who did. Medical personnel then intubated Kama to assist with his breathing, and he was unable to speak. Doctors operated on Kama to repair life threatening injuries.

Meanwhile, several officers from the Clark County Sheriff's Office arrived at the scene after Kama had been transported. Quinata told Sergeant Bill Roberts that she and Kama had argued that night and she told Kama that he had to move out. Quinata also told Detective Wayne Phillips and Deputy Eric Dunham that she and Kama had been arguing and she had asked him to leave. She stated that after she had asked Kama to leave, he walked from the kitchen to the

---

[1] At trial, Quinata admitted that Kama had not attempted to stab himself. Instead, she testified that she had accidentally "poked" Kama in the chest as he came around a corner and walked into her as she was eating her dinner. 3 RP at 489.

carport a few times as she prepared and started to eat her dinner; at some point after he had gone in and out a few times, she then realized that he had blood or "a liquid" in "his stomach area" and Kama then collapsed in the hallway between the kitchen and the carport. 1A RP at 137. Quinata also told Detective Phillips that Kama "had mentioned about killing himself previously" and that he had also told her he would tell the officers that she had stabbed him. 1A RP at 138. In addition, she told Deputy Dunham that after she called 911 and started to apply pressure to the wound, Kama insisted she remove some of his clothing, hit her several times in the leg, pulled her hair, and said, "'I'm going to tell the cops you tried to kill me,' or something to that effect." 1B RP at 217.

## II. PROCEDURE

The State charged Quinata with attempted second degree murder and first degree assault. The State's witnesses testified as described above, and the jury heard the 911 tape.

### A. HEARSAY EVIDENCE

During trial, the State sought to introduce some of Kama's statements[2] through physician assistant Cassandra Sappington. Sappington first testified that Kama was unable to talk from the time he was admitted until after he was extubated following his surgery. When he was able to talk, "psych services evaluate[d] him and [made] a written record of what he said to them." 1B RP at 306. When the State asked Sappington what Kama had said, Quinata objected on hearsay

---

[2] Kama did not appear at trial to testify.

grounds.[3] The State argued that these statements were admissible as having been made for medical diagnosis and treatment. The trial court overruled the objection.

Sappington then testified that "psychiatry had an opportunity to assess" Kama based on concerns about "suicidal ideations." 1B RP at 307. Sappington then read from psychiatric services nurse practitioner Patricia Morgan's report:[4]

> In quotation marks it says, "Never." The patient denies having a history of depression ever. "Never any pills." The patient states that this was his "girlfriend" that stabbed him. The [registered nurse] also provided information to me regarding this and also states that this is the same information that was provided to her. That the patient did not have a suicide attempt but it was the patient's significant other that stabbed him. The patient has been in a marriage. . . .
>
> . . . .
>
> . . . The patient has been in a marriage but he also has a significant other. He has been in this relationship for one year. The patient does state that he has a history of physical abuse with the girlfriend but he minimizes this. He states that his girlfriend and he were arguing on the day of this stab wound. He came "around the corner", that's in quotation marks, and "I was poked" is in quotation marks. "I do [sic] not even know I was hurt until I saw the blood," quotation marks. I woke up today and was told you were coming and I wanted to tell my story.

1B RP at 307-10. Sappington, who had no independent knowledge of Kama's statements, also testified that the information in quotations in the report were probably direct quotes from the patient, whereas the rest of the report was likely "just a generalized impression of what [the patient was] saying." 1B RP at 311.

---

[3] Quinata objected again later because Sappington was not the person to whom Kama had spoken. The State argued that Sappington's testimony was admissible because she was testifying about "medical records made in the regular course of business." 1B RP at 308. The trial court overruled Quinata's objection.

[4] Morgan dictated this report on October 16, 2010; she "authenticated" it the next day. 1B RP at 313.

## B. QUINATA'S TESTIMONY

Quinata was the sole defense witness. She testified that while she was eating her dinner on the night of the incident, she and Kama had been arguing and she had asked Kama to leave. She asserted that she had been eating her sandwich with a sharp knife and fork and she had accidentally "poked" Kama in the chest as he came around a corner and walked into her. 3 RP at 489. She did not realize that Kama was injured until he collapsed after walking in and out of the house. Quinata stated that she was on the phone with her son when Kama collapsed and she called 911 after examining Kama and noticing blood on his shirt.

Quinata explained that she told the 911 dispatcher that Kama had tried to kill himself because she (Quinata) panicked when Kama started to scream that she was trying to kill him. Quinata also admitted that she told the emergency responders that Kama had tried to commit suicide. She testified that she told the emergency responders this because Kama was "screaming that [she] was trying to kill him," and she did not "want to get in trouble" because that was not what happened. 3 RP at 501-02.

Quinata further testified that she did not tell any of the investigating officers that she had "poked" Kama or mention this in her written statement because she was scared. Quinata was unsure of what she had done with the knife, but she believed that it was either on the kitchen counter or in the kitchen sink.

Defense counsel also asked Quinata whether she had "had a long time to think about this incident." 3 RP at 509. She responded that she had and that she realized that she shouldn't have lied and that she likely would not be on trial if she had just told the truth.

5

## C. Closing Arguments

In closing argument, the prosecutor played the 911 call (which included Quinata telling the 911 dispatcher that Kama had stabbed himself) and told the jury that Quinata was now telling a very different story. The prosecutor argued that although Quinata claimed to be telling the truth now and trying to take "responsibility," she was, in fact, just changing her story to fit the evidence the jury had heard "*[a]fter watching three days of testimony in which every little piece was picked apart.*" 3 RP at 584 (emphasis added). Throughout her argument and the rebuttal, the prosecutor asserted that Quinata had changed her story in response to the evidence she had heard during the trial because she realized that the jury would not have believed her original claim that Kama had stabbed himself. The prosecutor also argued that Quinata's claim that the stabbing was an accident was not "reasonable" because it did not make sense based on Quinata's and Kama's relative heights and the nature of Kama's injuries. 3 RP at 597.

Defense counsel argued that Kama's statement to Morgan was not inconsistent with Quinata's testimony, that all Kama told Morgan was that he came around a corner and was "poked," that Kama did not realize until later that he was injured, and that this statement did not establish that Quinata had *intentionally* stabbed him with intent to kill him. 3 RP at 609. Defense counsel also argued that the State had not presented any evidence about the amount of force it would have taken to stab Kama or whether the knife Quinata said she had been using was capable of inflicting such injury.

In rebuttal, the prosecutor argued that the jury could rely on common sense when determining whether Kama's injuries were consistent with Quinata's testimony and that the State was not required to present testimony about this issue from a doctor. The prosecutor further argued,

*The State does not -- did not bring in a -- a person to testify about how much force it would take for someone to accidently [sic] stab someone in the chest because the State did not know that the Defendant was going to change her story until today, until you sat here today.* That was the first time. So, there was no witness to come in and talk about force. But, you know what? There are the twelve of you, there's a jury that gets to use your common sense.

3 RP at 632 (emphasis added). Quinata did not object to any of the prosecutor's argument.

The jury found Quinata not guilty of attempted murder, but found her guilty of first degree assault. Quinata appeals her conviction.

## ANALYSIS

### I. NO ART. II, § 19 VIOLATION

Quinata first contends that the first degree assault statute, RCW 9A.36.011, is unconstitutional because it was enacted in violation of Wash. Const. art. II, § 19, which provides that "[n]o bill shall embrace more than one subject, and that shall be expressed in the title." Specifically, she argues that (1) the 1986 legislation enacting former RCW 9A.36.011 (1986), which altered the mens rea required to commit the crime of first degree assault and added a third alternative means of committing the offense, violated the single subject rule because RCW 9A.36.011 was not within the scope of the bill's title, which addressed only the sentencing of adult felons; and (2) this error was not cured by the 1997 amendment to the 1986 version of the statute because that legislation also violated the single subject rule. We disagree.

### A. STANDARD OF REVIEW AND ART. II, § 19

We review constitutional issues de novo. *Bellevue Sch. Dist. v. E.S.*, 171 Wn.2d 695, 702, 257 P.3d 570 (2011). "A statute is presumed constitutional and the parties challenging its constitutionality must demonstrate its unconstitutionality beyond a reasonable doubt." *Belas v. Kiga*, 135 Wn.2d 913, 920, 959 P.2d 1037 (1998).

Article II, section 19 contains two prohibitions: (1) no bill shall embrace more than one subject (single subject rule), and (2) that the bill's title shall express the bill's subject (subject-in-title rule). *Citizens for Responsible Wildlife Mgmt. v. State*, 149 Wn.2d 622, 632, 71 P.3d 644 (2003) (citing *State ex rel. Wash. Toll Bridge Auth. v. Yelle*, 32 Wn.2d 13, 23, 200 P.2d 467 (1948)). A violation of either the single subject or the subject-in-title requirement renders the bill unconstitutional. *Patrice v. Murphy*, 136 Wn.2d 845, 852, 966 P.2d 1271 (1998).

*State v. Stannard*, 134 Wn. App. 828, 834, 142 P.3d 641 (2006).

Our Supreme Court has, however, stated, "[T]hat when a statute is challenged on the basis that its title violates article II, section 19, a later amendment to or reenactment of the statute supersedes and therefore 'cure[s] any defect' in the earlier legislation." *Morin v. Harrell*, 161 Wn.2d 226, 231, 164 P.3d 495 (2007) (second alteration in original) (quoting *Pierce County v. State*, 159 Wn.2d 16, 39-41, 148 P.3d 1002 (2006)). Because the legislature amended former RCW 9A.36.011 in 1997, we do not need to address the 1986 legislation. Thus, Quinata must show that the *1997* legislation violated the single subject rule; this she fails to do.

## B. No Constitutional Violation

Quinata argues that the 1997 legislation did not cure the 1986 defect because the 1997 bill was titled, "AN ACT Relating to crimes," and this title was not broad enough to encompass the portions of the bill that related to changes to civil detention hearings for human immunodeficiency virus-infected people who engage in behaviors dangerous to public health.[5] *See* LAWS OF 1997, ch. 196, § 5. But Quinata fails to recognize that even if we assume the civil detention portion of the 1997 bill went beyond the bill's title, the other portions of the bill could be severed from the arguably objectionable portion of the bill. *See State v. Thomas*, 103 Wn.

---

[5] The governor vetoed this section of the bill. *See* LAWS OF 1997, ch. 196, § 5.

App. 800, 813-14, 14 P.3d 854 (2000), *review denied*, 143 Wn.2d 1022 (2001). As we stated in

*Thomas*,

> [W]here the proposed legislation with a single subject title contains multiple subjects, those provisions not encompassed within the title are invalid but the remainder is constitutional if: (1) the objectionable portions may be severed such that a court can presume the enacting body would have enacted the valid portion without the invalid portion; and (2) elimination of the invalid part would not render the remainder of the act incapable of accomplishing the legislative purpose. [*State v. Broadaway*, 133 Wn.2d 118, 128, 942 P.2d 363 (1997).] In short, when an act contains provisions not fairly within the single subject of its title, such provisions are void. [*Power, Inc. v. Huntley*, 39 Wn.2d 191, 200, 235 P.2d 173 (1951).] *See also Price v. Evergreen Cemetery Co. of Seattle*, 57 Wn.2d 352, 354, 357 P.2d 702 (1960).

103 Wn. App. at 813-14 (footnote omitted). Here, even presuming that the civil detention

portions of the legislation went beyond the bill's title, those portions of the 1997 amendment can

easily be severed. Quinata does not argue, nor does it appear, that the remaining portions of the

legislation are not within the bill's title. Because Quinata does not show that the 1997 legislation

failed to cure any alleged defect in the 1986 legislation, she cannot show that RCW 9A.36.011 is

unconstitutional under art. II, § 19, and this argument fails.

## II. CONFRONTATION CLAUSE CHALLENGE

Quinata next argues that the trial court violated her Sixth and Fourteenth Amendment

right to confront witnesses by admitting testimonial hearsay in the form of Sappington's

testimony about Morgan's report, which, in turn, contained hearsay about what Kama had said.

She argues that there were "multiple layers of testimonial hearsay, one produced by Kama, a

second by Patty Morgan of 'psych services,' and a third by an unnamed transcriptionist who

typed up Morgan's dictated report." Br. of Appellant at 20. Regardless of whether Quinata has

properly preserved these arguments,[6] and assuming but not deciding that Morgan's report contained testimonial hearsay, Quinata's confrontation clause argument fails because the record establishes that the admission of this testimony was harmless beyond a reasonable doubt.

"[C]onfrontation clause violations are subject to harmless error analysis." *State v. Beadle*, 173 Wn.2d 97, 119, 265 P.3d 863 (2011) (citing *State v. Koslowski*, 166 Wn.2d 409, 431, 209 P.3d 479 (2009)). Although we presume that a constitutional error is prejudicial, a constitutional error is harmless if we are assured beyond a reasonable doubt that the jury verdict is unattributable to the error. *State v. Watt*, 160 Wn.2d 626, 635, 160 P.3d 640 (2007). The State bears the burden of establishing that the error was harmless. *Watt*, 160 Wn.2d at 635.

Although no other witnesses testified that Kama had stated that Quinata had "poked" him, one of the paramedics testified that on the way to the hospital, Kama stated, "[H]e did not stab himself but he was unable to relay who did." 1A RP at 66. Although this statement did not identify who had "stabbed" Kama, there was no one else in the house and there was no allegation at trial that another person was present when Kama was injured. Additionally, in her 911 call and her statements to Deputy Dunham and Detective Phillips, Quinata herself stated that Kama was accusing her of having stabbed him. Quinata did not challenge any of this evidence. Because the jury heard this other evidence and Kama's statement to Morgan is merely cumulative, we hold beyond a reasonable doubt that the jury's verdict was not attributable to

---

[6] *See* RAP 2.5(a).

Kama's statement to Morgan.[7] Because the State can establish any potential error was harmless, Quinata's confrontation clause argument fails.

### III. HEARSAY CHALLENGE

Quinata further argues that the trial court erred when it admitted Sappington's testimony about Kama's statements to Morgan as statements for medical diagnosis or treatment under ER 803(a)(4).[8] Again, we disagree.

We review a trial court's evidentiary rulings for abuse of discretion. *State v. Ellis*, 136 Wn.2d 498, 504, 963 P.2d 843 (1998). A court abuses its discretion when its evidentiary ruling is "'manifestly unreasonable, or exercised on untenable grounds, or for untenable reasons'" (*State v. Downing*, 151 Wn.2d 265, 272-73, 87 P.3d 1169 (2004) (quoting *State ex. rel. Carroll v. Junker*, 79 Wn.2d 12, 26, 482 P.2d 775 (1971)), or if "no reasonable person would take the view adopted by the trial court." *State v. Castellanos*, 132 Wn.2d 94, 97, 935 P.2d 1353 (1997) (citing *State v. Huelett*, 92 Wn.2d 967, 969, 603 P.2d 1258 (1979)). Evidentiary error is grounds for reversal only if it results in prejudice. *State v. Neal*, 144 Wn.2d 600, 611, 30 P.3d 1255 (2001). "An error is prejudicial if, 'within reasonable probabilities, had the error not occurred, the outcome of the trial would have been materially affected.'" *Neal*, 144 Wn.2d at 611 (quoting

---

[7] Furthermore, because Quinata admitted that she had been eating her sandwich with a sharp knife and fork and she had accidentally "poked" Kama in the chest as he came around a corner and walked into her, 3 RP at 489, who stabbed Kama was not at issue at trial and the medical records did not address whether the stabbing was intentional or accidental, these records are even less harmful.

[8] ER 803(a)(4) establishes the following exception to the hearsay rule:
*Statements for Purposes of Medical Diagnosis or Treatment.* Statements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment.

11

*State v. Smith*, 106 Wn.2d 772, 780, 725 P.2d 951 (1986)). And a trial court's erroneous admission of hearsay statements is harmless when the jury has heard substantially similar testimony without objection. *State v. Weber*, 159 Wn.2d 252, 276, 149 P.3d 646 (2006) (quoting *Ashley v. Hall*, 138 Wn.2d 151, 159, 978 P.2d 1055 (1999)), *cert. denied*, 551 U.S. 1137 (2007).

"Hearsay" is a statement "offered in evidence to prove the truth of the matter asserted." ER 801(c). Hearsay evidence is not admissible unless it fits under a recognized exception to the hearsay rule, in which case we presume its reliability.[9] *State v. Athan*, 160 Wn.2d 354, 383, 158 P.3d 27 (2007). In instances of multiple hearsay, each level of hearsay must be independently admissible. ER 805. Here, Sappington's testimony is double hearsay—Kama's statements to Morgan are the first level of hearsay, and Morgan's report to Sappington is the second level.[10] *See* ER 801(c).

One exception to the hearsay rule is ER 803(a)(4). Under this rule, admissible statements include those "reasonably pertinent to diagnosis or treatment." ER 803(a)(4). "To be admissible, the declarant's apparent motive must be consistent with receiving treatment, and the statements must be information on which the medical provider reasonably relies to make a diagnosis." *State v. Fisher*, 130 Wn. App. 1, 14, 108 P.3d 1262 (2005), *review denied*, 156 Wn.2d 1013 (2006). "The rationale is that we presume a medical patient has a strong motive to

---

[9] "The hearsay prohibition serves to prevent the jury from hearing statements without giving the opposing party a chance to challenge the declarants' assertions." *Brundridge v. Fluor Fed. Servs., Inc.*, 164 Wn.2d 432, 451-52, 191 P.3d 879 (2008).

[10] On appeal, Quinata argues that this evidence was "triple hearsay": Kama to Morgan, Morgan to a transcriptionist, and Morgan's report through Sappington. During the trial, Quinata arguably objected to two layers of hearsay, but she did not argue that the fact that Morgan's report was transcribed was an additional layer of hearsay. Accordingly, we treat this argument as a double hearsay argument. See RAP 2.5(a).

be truthful and accurate. This provides a significant guarantee of trustworthiness." *State v. Perez*, 137 Wn. App. 97, 106, 151 P.3d 249 (2007). Kama's statements to Morgan that he had not injured himself were clearly for the purpose of diagnosis and treatment—Morgan was attempting to ensure that Kama was not suicidal. And Kama's statement to Morgan that Quinata had stabbed him were relevant to Kama's treatment and diagnosis because the identity of his assailant could affect his treatment. *State v. Williams*, 137 Wn. App. 736, 746, 154 P.3d 322 (2007) ("In domestic violence . . . situations, a declarant's statement disclosing the identity of a closely-related perpetrator is admissible under ER 803(a)(4) because part of reasonable treatment and therapy is to prevent recurrence and future injury." (citing *State v. Ackerman*, 90 Wn. App. 477, 482, 953 P.2d 816 (1998); *State v. Sims*, 77 Wn. App. 236, 239, 890 P.2d 521 (1995))).[11]

Accordingly, the trial court did not abuse its discretion when it admitted Kama's statements as statements for medical diagnosis or treatment under ER 803(a)(4).

Furthermore, as we discussed above, the admission of this evidence was harmless, particularly in light of the other, similar evidence to which Quinata did not object. Accordingly, this argument also fails.

---

[11] Another exception to the hearsay rule is the business records exception. *State v. Garrett*, 76 Wn. App. 719, 725-26, 887 P.2d 488 (1995). A record of an act, condition or event, shall in so far as relevant, be competent evidence if the custodian or other qualified witness testifies to its identity and the mode of its preparation, and if it was made in the regular course of business, method and time of preparation were such as to justify its admission. RCW 5.45.020. At trial, Quinata asserted a general hearsay objection, and the State relied on the medical treatment exception as well as the business record exception. Quinata now argues that the State failed to lay a sufficient foundation to establish the report was a business record. But Quinata did not object at trial on this ground; accordingly, we do not address this argument. *See* RAP 2.5(a).

IV. PROSECUTORIAL MISCONDUCT

Quinata next argues that the prosecutor engaged in prosecutorial misconduct in closing argument. Specifically, she argues that the prosecutor improperly (1) commented on Quinata's right to be present and to confront the prosecution witnesses, and (2) argued facts not in evidence. Quinata contends that each of these errors was flagrant and ill intentioned, and because these errors pervaded the State's entire closing argument, would not have been cured by any objection. Again, we disagree.

A. STANDARD OF REVIEW

To establish prosecutorial misconduct, Quinata has the burden of establishing that the challenged conduct was both improper and prejudicial. *State v. Cheatam*, 150 Wn.2d 626, 652, 81 P.3d 830 (2003). We review the prosecutor's conduct "by examining that conduct in the full trial context, including the evidence presented, 'the context of the total argument, the issues in the case, the evidence addressed in the argument, and the instructions given to the jury.'" *State v. Monday*, 171 Wn.2d 667, 675, 257 P.3d 551 (2011) (internal quotation marks omitted) (quoting *State v. McKenzie*, 157 Wn.2d 44, 52, 134 P.3d 221 (2006)). "Once [the] defendant has demonstrated that the prosecutor's conduct was improper, we evaluate the defendant's claim of prejudice on the merits under two different standards of review depending on whether the defendant objected at trial." *State v. Sakellis*, 164 Wn. App. 170, 183, 269 P.3d 1029 (2011), *review denied*, 176 Wn.2d 1004 (2013).

Because Quinata failed to object to the portions of the prosecutor's argument that she now challenges, she is deemed to have waived any error "unless the prosecutor's misconduct was so flagrant and ill intentioned that an instruction could not have cured the resulting prejudice." *State v. Emery*, 174 Wn.2d 741, 760-61, 278 P.3d 653 (2012). "Under this

14

heightened standard, [Quinata] must show that (1) 'no curative instruction would have obviated any prejudicial effect on the jury' and (2) the misconduct resulted in prejudice that 'had a substantial likelihood of affecting the jury verdict.'" *Emery*, 174 Wn.2d at 761 (quoting *State v. Thorgerson*, 172 Wn.2d 438, 455, 258 P.3d 43 (2011). When applying this standard, our focus is "less on whether the prosecutor's misconduct was flagrant or ill intentioned and more on whether the resulting prejudice could have been cured." *Emery*, 174 Wn.2d at 762.

## B. Tailoring

Quinata argues that the prosecutor improperly commented on Quinata's art. I, § 22 right to appear and defend in person and to confront witnesses. This is essentially a "tailoring" argument.[12]

Quinata appears to argue that under *State v. Martin*, 171 Wn.2d 521, 252 P.3d 872 (2011), prosecutors are never allowed to make a tailoring argument in closing argument because such arguments violate Wash. Const. art. I, § 22. We disagree.

*Martin* addressed a prosecutor's questioning of a defendant in cross-examination, not, as is the case here, a prosecutor's statement in closing argument. *See* 171 Wn.2d at 533-34. The *Martin* court held that "our state constitution was not violated when a deputy prosecutor, in response to testimony [the defendant] had given on direct examination, asked [the defendant] if he had tailored his testimony to conform to testimony given by other witnesses," because the

---

[12] Quinata appears to argue that the prosecutor's argument went beyond an assertion that Quinata had tailored her testimony to fit the evidence she had heard during the trial because the prosecutor suggested that Quinata had "created her whole version of events from the testimony she heard at trial." Br. of Appellant at 31. We see no distinction between an assertion that a defendant has "tailored" some of his or her testimony to fit the evidence presented at trial and an assertion that the defendant has invented an entirely new story based on the evidence presented at trial. In both instances the defendant has presented the jury with facts based on the previously presented evidence. Accordingly, we consider this argument to be a "tailoring" argument.

defendant's testimony included a statement that he based his testimony in part on other evidence presented at trial, squarely placing the defendant's credibility at issue. 171 Wn.2d at 537-38. But *Martin* did not address whether a prosecutor may argue tailoring in closing argument and, apart from its pronouncement that art. I, § 22 is more protective than its federal counterpart, is not particularly informative here.

Unlike *Martin, State v. Berube*, 171 Wn. App. 103, 116, 286 P.3d 402 (2012), *review denied*, 178 Wn.2d 1002 (2013), a case from Division One of this court, is directly on point. In *Berube*, the court rejected the same argument Quinata now makes. Noting that the *Martin* court had expressly declined to address "generic tailoring arguments," the court held that it was not prosecutorial misconduct for a prosecutor to assert in closing argument that a defendant had tailored his or her testimony "[w]hen tailoring is alleged based on the defendant's testimony on direct examination, the argument is a logical attack on the defendant's credibility and does not burden the right to testify." *Berube*, 171 Wn. App. at 116-17. We agree.

Here, it was clear that Quinata's trial testimony was substantially different than the statements she made at the time of the incident, there was no evidence that Quinata had claimed the stabbing was accidental before the trial, and Quinata used the same words to describe the incident that Kama used in describing it to Morgan. The prosecutor's tailoring argument was based on Quinata's testimony, which was the type of argument that the *Berube* court approved. 171 Wn. App. at 106 ("Nor does a prosecutor commit misconduct by arguing that the defendant tailored his account of events in response to other witnesses' testimony where the argument is

based on defendant's testimony on direct examination."). Quinata fails to establish prosecutorial misconduct on this ground.[13]

### C. ARGUING FACTS OUTSIDE THE RECORD AND PERSONAL OPINION

Finally, Quinata argues that the prosecutor's argument stating that Quinata had changed her defense theory that same day and that the State was unaware of that change in time to present a witness to testify about the amount of force necessary to stab a person in the chest was improper because this evidence was not before the jury. Although these facts were not in the record,[14] the trial court instructed the jurors that the prosecutor's argument was not evidence and that they must disregard any statement or argument not supported by the record. We presume the jury follows the trial court's instructions. *State v. Foster*, 135 Wn.2d 441, 472, 957 P.2d 712 (1998). Thus, even presuming the prosecutor engaged in misconduct, we hold that Quinata does not show prejudice under the heightened prejudice standard.

To the extent Quinata also argues that the prosecutor's arguments amounted to personal opinion of Quinata's guilt when it advised the jury that Quinata had changed her defense that day and that the State was unaware of that change in time to obtain a witness who could testify about

---

[13] Because Quinata does not show that the prosecutor engaged in misconduct, we need not address whether she has shown prejudice. *See Sakellis*, 164 Wn. App. at 183.

Furthermore, given that (1) the evidence clearly showed that Quinata's trial defense was distinctly different from the account she had previously given; (2) the jury was well aware that Quinata was present during the trial and heard all of the evidence; and (3) Quinata's use of some of the same language from Morgan's report, the jury could have easily concluded on its own that Quinata was tailoring her testimony to fit the trial evidence. Thus, the prosecutor's tailoring argument, to the extent it was improper, did not have a substantial likelihood of affecting the verdict under the heightened prejudice standard. *Emery*, 174 Wn.2d at 761; *see also Sakellis*, 164 Wn. App. at 183.

[14] The State did not present any evidence establishing that it had not had time to seek an expert witness. But the record does reflect that the State had attempted to locate such a witness after presenting its rebuttal witness.

the amount of force the stabbing took, that argument has no merit. Not only could such an error have easily been cured by an instruction advising the jury to disregard this portion of the argument, nothing in the prosecutor's argument suggests that the prosecutor was offering her personal belief of Quinata's guilt.

We affirm.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

JOHANSON, J.

We concur:

WORSWICK, C.J.

LEE, J.