[No. 28101.   *En Banc.*   February 28, 1941.]

P<small>IO</small> D<small>E</small>C<small>ANO</small> *et al., Respondents,* v. T<small>HE</small> S<small>TATE</small> <small>OF</small> W<small>ASHINGTON</small> *et al., Appellants.*[1]

[1]Reported in 110 P. (2d) 627.

614

*The Attorney General, John E. Belcher, Assistant, B. Gray Warner,* and *William Hickman Moore,* for appellants.

*Austin E. Griffiths,* for respondents.

*Wettrick, Flood, O'Brien & Stuntz, amicus curiae.*

DRIVER, J.—This action was instituted under the declaratory judgment act, Rem. Rev. Stat. (Sup.), §§ 784-1 to 784-17 [P. C. §§ 8108-21 to 8108-37], inclusive (Laws of 1935, chapter 113, p. 305, as amended by Laws of 1937, chapter 14, p. 39), to obtain an adjudication of the validity and effect of Laws of 1921, chapter 50, p. 156, as amended by Laws of 1937, chapter 220, p. 1092 (Rem. Rev. Stat. (Sup.), §§ 10581 to 10588 [P. C. § § 135 to 136-6], inclusive), commonly known as the anti-alien land law.

The defendants, state of Washington and B. Gray Warner, as prosecuting attorney of King county, filed separate cross-complaints by which they sought to have the lands of plaintiff DeCano forfeited to the state. After a trial without a jury, the lower court, by a memorandum opinion, announced its conclusion that the 1937 amendatory statute contravened Art. II, § 19, of the state constitution, which provides that "No bill shall embrace more than one subject, and that shall be expressed in the title."

Judgment was entered declaring and establishing that the plaintiffs were legally entitled to acquire and own and to exercise all of the incidental rights of ownership of land within the state. This appeal by the defendants followed.

There is no substantial dispute as to the facts. Respondent DeCano, a native Filipino, was born in the Philippine Islands in 1894 and resided there continuously until he migrated to the United States in 1911. Since 1914, he has been a resident of Seattle, where he

owns, in fee simple, a tract of land which he acquired in May, 1939. In March, 1939, respondent DeCano had filed with the clerk of the United States district court at Seattle his declaration of intention to become a citizen of the United States. He has never served in the United States Navy, Marine Corps, Naval Auxiliary Service, or the Coast Guard, nor, so far as the record discloses, has he ever applied for enlistment therein either before or after the filing of his declaration of intention.

Respondent Seattle Filipino Community Clubhouse (for convenience, hereinafter termed the corporate respondent) is a nonprofit corporation organized and existing under the laws of the state of Washington. All of its members are native Filipinos. It owns no real property, or interest in real property, and it has not contracted for the purchase thereof, but one of its purposes, according to the testimony of its president, is to acquire a tract of land for a clubhouse site in the city of Seattle.

At the very threshold of the case, we encounter this question: May the corporate respondent maintain this declaratory judgment action under the circumstances just stated?

One may not, by such action, challenge the constitutionality of a statute unless it appears that he will be directly damaged in person or in property by its enforcement. *Acme Finance Co. v. Huse*, 192 Wash. 96, 73 P. (2d) 341, 114 A. L. R. 1345. The action must also be adversary in character and involve a present and actual, as distinguished from a possible or potential, controversy between the parties. *Washington Beauty College v. Huse*, 195 Wash. 160, 80 P. (2d) 403; *State v. Fruitland Irr. Dist.*, 196 Wash. 11, 81 P. (2d) 844; and *Adams v. Walla Walla*, 196 Wash. 268, 82 P. (2d) 584.

In the instant case, there is no actual and present controversy between the corporate respondent and the appellants. The anti-alien land statute does not directly affect or threaten the corporation's rights, and would do so at some indeterminate time in the future only in the event that it should acquire, or at least enter into a contract to acquire, real property within the state. The corporate respondent has, therefore, failed to meet the requirements of justiciability and is not entitled to maintain a declaratory judgment action.

As to the respondent DeCano, the following questions are presented for determination:

(1) Are native Filipinos subject to the anti-alien land statute as amended because of its special definition of "alien" to include "all persons who are non-citizens of the United States and who are ineligible to citizenship by naturalization"?

(2) Is respondent DeCano, under the circumstances of the present case, within the following exception of the statute: " 'Alien' does not include an alien who has in good faith declared his intention to become a citizen of the United States"?

(3) Does the 1937 statute, by reason of inadequacy of its title, violate Art. II, § 19, of the state constitution?

To answer these questions, we must inquire into the citizenship status and eligibility for naturalization of native Filipinos under the laws of the United States.

It has been a long-standing, traditional policy of the United States to limit citizenship by naturalization to members of the white race. An exception to this policy was the broadening of eligibility to include aliens of African nativity and persons of African descent by an act of Congress passed not long after the Civil War. 18 Stat. 318, Rev. Stat., § 2169 [8 U. S. C. A., § 359]. Otherwise, the limitation of naturalization by the cited

statute to "aliens being free white persons" has remained intact, and subsequent exceptions have not included nonwhite races, as a whole and as such, but have been limited to particular individual members thereof who can meet certain special requirements, such as service in the military or naval establishment of the United States. See § 359, and §§ 388 to 390 and 392 to 394, inclusive, of Title 8, U. S. C. A.

As a result of the war with Spain, the United States acquired new territories, including the Philippine Islands, in which a considerable portion of the population consisted of native inhabitants. The cession was effected under the Treaty of Paris, proclaimed April 11, 1899, 30 Stat. 1754, which provided that Spanish subjects residing in the ceded territory, natives of the Peninsula of Spain, might, by making a prescribed declaration, elect to preserve their allegiance to the Spanish Crown, in the absence of which declaration they should be deemed to have renounced it, "and to have adopted the nationality of the territory in which they may reside." As to natives of the Islands, however, the treaty recited that "The civil rights and political status of the native inhabitants of the territories hereby ceded to the United States shall be determined by the Congress." Congress, by § 4 of its Act of July 1, 1902, 32 Stat. 692, then declared:

"That all inhabitants of the Philippine Islands continuing to reside therein who were Spanish subjects on the eleventh day of April, eighteen hundred and ninety-nine, and then resided in said Islands, and their children born subsequent thereto, shall be deemed and held to be citizens of the Philippine Islands and as such entitled to the protection of the United States, . . ."

Thereafter, and prior to the passage of the act of June 29, 1906, § 30, 34 Stat. 606, 8 U. S. C. A., § 360, this anomalous situation existed: Citizens of the Philip-

pine Islands, regardless of race or color, were not eligible to United States naturalization because they were not *aliens* and naturalization was limited to *aliens* "being free white persons, and to aliens of African nativity and to persons of African descent" by the express terms of Rev. Stat., § 2169 [8 U. S. C. A., § 359], cited *supra*. However, the act of June 29, 1906, § 30, provided that:

"All the applicable provisions of the naturalization laws of the United States shall apply to and be held to authorize the admission to citizenship of all persons not citizens who owe permanent allegiance to the United States, and who may become residents of any State or organized Territory of the United States, with the following modifications: The applicant shall not be required to renounce allegiance to any foreign sovereignty; . . ." (8 U. S. C. A., § 360.)

This statute clearly modified § 2169 of the Revised Statutes by removing the requirement of alienage as to citizens of the Philippine Islands, but it was long a controversial question whether it extended the race and color limitation to include such citizens of the Filipino race. The following cases held them eligible for United States naturalization: *In re Mallari*, 239 Fed. 416, and *In re Bautista*, 245 Fed. 765. The following cases held them ineligible: *In re Alverto*, 198 Fed. 688; *In re Lampitoe*, 232 Fed. 382; *In re Rallos*, 241 Fed. 686.

In 1918, Congress amended § 4 of the act of June 29, 1906, by adding thereto a seventh subdivision (40 Stat. 542 [8 U. S. C. A. (Sup.), § 388]). This amendatory statute, with that portion thereof which has been added or altered by amendments subsequent to 1918 printed in italics, reads, in part, as follows:

"Any native-born Filipino of the age of twenty-one years and upward who has declared his intention to become a citizen of the United States and who has en-

listed or may enlist in the United States Navy or Marine Corps or the Naval Auxiliary Service *or the Coast Guard,* and who, after service of not less than three years, may be honorably discharged therefrom, or who may receive an ordinary discharge with recommendation for reenlistment; . . . may, on presentation of the required declaration of intention petition for naturalization *and may be naturalized without complying with the requirements of residence within the United States and within the county."* (Italics ours.)

In *Toyota v. United States,* 268 U. S. 402, 69 L. Ed. 1016, 45 S. Ct. 563, the supreme court of the United States, after calling attention to the conflict of opinions under the Federal court cases which we have already cited regarding the eligibililty of Filipinos for naturalization, stated:

"But we hold that until the passage of that act [act of May 9, 1918, 8 U. S. C. A., § 388], Filipinos not being 'free white persons' or 'of African nativity' were not eligible, and that the effect of the act of 1918 was to make eligible, and to authorize the naturalization of, native-born Filipinos of whatever color or race having the qualifications [service in the Navy, Marine Corps, etc.] specified in the seventh subdivision of § 4."

In *De La Ysla v. United States,* 77 F. (2d) 988 (certiorari denied, 296 U. S. 575, 56 S. Ct. 138), the ninth circuit court of appeals held that a citizen of the Philippine Islands, of the Filipino race, who had not served in the Navy or other requisite service, could not acquire United States citizenship by naturalization. Regarding the effect of the 1918 amendment (8 U. S. C. A., § 388) to § 4 of the act of June 29, 1906, the court stated:

"The effect of this amendment was to make eligible and to authorize the naturalization of native-born Filipinos, of whatever color or race, having the qualifications specified in the seventh subdivision of section 4, *but as to those not possessing such qualifications, the*

*distinction based on color and race was not eliminated."* (Italics ours.)

Can we say, then, that Filipinos, as a race, are non-citizens of the United States "ineligible to citizenship by naturalization" within the meaning of the Laws of 1937, chapter 220?

■ The above-cited Federal statutes, as construed by the Federal courts, limit United States citizenship by naturalization to the white race with the exception of aliens of African nativity and persons of African descent. Native Filipinos may be citizens of the Philippine Islands, but they are not citizens of the United States, and, as a racial group, they are subject to this racial limitation on naturalization, although an individual Filipino possessing the necessary personal qualifications for acceptance in the service of the Navy or other designated establishment, who satisfactorily completes at least a three year term of enlistment therein, then becomes eligible for naturalization. Therefore, Filipinos, as a race or class, are within the purview of the 1937 state statute.

■ Passing now to the second question under consideration, respondent DeCano contends that, in any event, the statute does not apply to him because he comes within its exception: " 'Alien' does not include an alien who has in good faith declared his intention to become a citizen of the United States, . . ." He has, it is true, filed such a declaration of intention and, under ordinary circumstances, his good faith would be presumed, or, to put it conversely, bad faith on his part would not be presumed. This is not, however, an ordinary situation. As a member of the Filipino race, he is not eligible to naturalization. As an individual, he may or may not be eligible, depending largely upon factors over which he has no control.

Assuming that he intends, in the utmost good faith,

to enlist in the Navy or other related service, he may not be qualified or acceptable. We shall not pass upon the question whether we may take judicial notice of the departmental regulations specifying the requirements for enlistment in the various services in question, as it is not necessary for us to do so. It is a matter of common knowledge, of which we may properly take notice, that *there are* definite requirements. For example, to be acceptable for enlistment, an applicant must be within certain age limits, above a minimum height and weight, and free of serious physical defect, deformity, or disease.

Respondent DeCano has not served three years in any of the prescribed government establishments, nor has he even applied for enlistment therein, although his declaration of intention was filed more than a year prior to the trial. In his particular situation, he cannot rely solely upon a naked presumption that his declaration of intention was made in good faith in the absence of some showing on his part that, at least, he is qualified and acceptable for enlistment and can feasibly render the prescribed service which alone can remove his racial disqualification for naturalization.

Somewhat analogous to the statutory "good faith" requirement here under consideration, is the provision of the Federal bankruptcy act that a petition for reorganization of a debtor under § 77B (a), 48 Stat. 912 (11 U. S. C. A., § 207 (a)) shall be dismissed unless the court is satisfied that such petition was filed in good faith. The Federal courts have held that "in good faith" in this connection, in the light of the tenor of the statute in which the phrase appears, imports more than sincerity of motive or honesty of purpose on the part of the petitioner. It must also be shown that the object sought to be accomplished by the petition is feasible. *Tennessee Pub. Co. v. American Nat. Bank,*

299 U. S. 18, 81 L. Ed. 13, 57 S. Ct. 85; *Witters Associates v. Ebsary Gypsum Co.*, 93 F. (2d) 746; *Snyder v. Fenner*, 101 F. (2d) 736.

In the last cited case, it was said that:

"Good faith at this stage of the proceeding imports an honest intention on the part of the petitioners to effect a reorganization of the debtor *together with a need for and a possibility of effecting it.*" (Italics ours.)

In the instant case, it is not necessary for us to precisely define the requirements of the phrase "in good faith" as applied to a noncitizen Filipino declarant. It is sufficient to hold that the respondent DeCano, under the circumstances, has not met such requirements. To do so, it would seem that he should, at least, show that his ultimate naturalization is feasible by applying for enlistment and procuring his induction into the Navy, Marine Corps, Naval Auxiliary service, or the Coast Guard of the United States.

The third and last question is whether the title of the Laws of 1937, chapter 220, p. 1092, is sufficiently expressive of its subject matter to comply with Art. II, § 19, of the state constitution.

Laws of 1921, chapter 50, p. 156, prohibited ownership of land by aliens, and in § 1 (a), p. 156, defined the word "alien" as follows:

" 'Alien' does not include an alien who has in good faith declared his intention to become a citizen of the United States, but does include all other aliens and all corporations and other organized groups of persons a majority of whose capital stock is owned or controlled by aliens or a majority of whose members are aliens; . . . "

The 1937 amendatory statute is entitled as follows: "An Act relating to the rights and disabilities of aliens with respect to land, and amending chapter 50, Laws of 1921, . . . "

The 1937 statute amended § 1 (a) of the earlier act by adding to the definition of "alien" the following clause: ". . . and [alien] does include all persons who are non-citizens of the United States and who are ineligible to citizenship by naturalization; . . . "

Thus the title of the 1937 statute states that it pertains to the rights of "aliens" with respect to land, but it gives no intimation whatsoever that the body of the act contains an amended definition of the word "alien" which brings within its purview a whole new class of persons who are not in fact aliens in common understanding, by judicial construction, or under the express definition contained in the prior law. (In this connection, it should be noted that the statute makes certain violations of its provisions a gross misdemeanor and also declares that land conveyed to or held by an alien is forfeited to the state.)

██ "Alien" is commonly understood and has been judicially defined to be a person who owes allegiance to a foreign government. *Ex parte Fung Sing,* 6 F. (2d) 670. The 1937 law, as we have pointed out, applies to native Filipinos, although it is well known that, since the Spanish-American War, they have owed allegiance only to the United States. Regardless of whatever uncertainty may have existed as to their precise status, whether quasi-citizens or American nationals, the United States supreme court, in effect, held, as early as 1904, in the case of *Gonzales v. Williams,* 192 U. S. 1, 48 L. Ed. 317, 24 S. Ct. 177, *that they are not aliens.*

In that case, it was decided that citizens of Porto Rico (whose status, with reference to United States nationality, is substantially identical with that of citizens of the Philippine Islands) were not aliens within the meaning of the Federal immigration laws.

In *Toyota v. United States,* 268 U. S. 402, *supra,* decided in 1925, the same court said: "The citizens of the

Philippine Islands are not aliens. See *Gonzales v. Williams,* 192 U. S. 1, 13."

In 1935, the United States circuit court of appeals for the ninth circuit squarely held, in *De La Ysla v. United States,* 77 F. (2d) 988, *supra,* that citizens of the Philippine Islands of the Filipino race are not aliens because, in the language of the opinion: "They owe no allegiance to any foreign government, but do owe allegiance to the United States."

A case quite apposite to the case at bar, and the only one brought to our attention involving the same factual situation, is *Petroleum Lease Properties Co. v. Huse,* 195 Wash. 254, 80 P. (2d) 774. There, the title of the 1937 amendment to the securities act was challenged as inadequate. The original statute, Laws of 1923, chapter 69, p. 207, provided for the regulation and supervision of the issuance and sale of certain securities, and, in the body of the statute, § 2, p. 208, "security" was broadly defined, in accordance with the commonly accepted meaning of the term, to include corporate stocks, shares or interests in companies, debentures, bonds, and the like. The challenged amendatory statute (Laws of 1937, chapter 182, p. 711) was entitled: "AN ACT providing for the regulation and supervision of the issuance and sale of securities to prevent fraud in the sale thereof, amending section 2, chapter 69, Laws of 1923, . . ."

The body of the 1937 statute enlarged the definition of "security," § 1, subd. (2) (e), p. 713, to include oil or gas leases. It was held that the amendatory act violated the state constitution because:

"The title gives no notice that there is to be embodied in the amendment the regulation of any matter not embraced within the meaning of the word 'security' as that term is commonly understood and defined by standard dictionaries, as well as by the original securities act itself."

The object of the constitutional requirement that a bill shall embrace but one subject, which must be expressed in the title, was stated in the opinion, in the language of Judge Cooley, as follows:

" ' . . . *first* to prevent *hodge-podge* or "log-rolling" legislation; *second,* to prevent surprise or fraud upon the legislature by means of provisions in bills of which the titles gave no intimation, and which might therefore be overlooked and carelessly and unintentionally adopted; and, *third,* to fairly apprise the people, through such publication of legislative proceedings as is usually made, of the subjects of legislation that are being considered, in order that they may have opportunity of being heard thereon, by petition or otherwise, if they shall so desire.' 1 Cooley's Constitutional Limitations (8th ed.), 296."

■ The following rule, quoted with approval in the cited case, from 59 C. J. 810, we consider equally applicable here:

"Words in a title must be taken in their common and ordinary meanings, and the legislature cannot in the body of an act impose another or unusual meaning upon a term used in the title without disclosing such special meaning therein."

Appellants cite numerous cases of this court in which statutes challenged as violative of Art. II, § 19, of the state constitution have been upheld. We shall not attempt to review them all. For the most part, they involve statutes having broad and comprehensive titles and serve only to enunciate and exemplify the general principles that the constitutional provision in question will be liberally construed so as not to impose hampering restrictions upon the legislature; and that the title of a statute need not be a complete index of its provisions, but is sufficient if it so indicates its substance and scope as to reasonably lead to an inquiry into its content. See *Shortall v. Puget Sound Bridge etc. Co.,*

45 Wash. 290, 88 Pac. 212, 122 Am. St. 899; *Northern Cedar Co. v. French,* 131 Wash. 394, 230 Pac. 837; *In re Peterson's Estate,* 182 Wash. 29, 45 P. (2d) 45; *Shea v. Olson,* 185 Wash. 143, 53 P. (2d) 615, 111 A. L. R. 998. We again endorse the sound and well-established general rules to which these cases subscribe. We have given them due consideration, but have, nonetheless, concluded that the title of the statute here involved is constitutionally insufficient.

In this connection, it should be noted that, in applying the general rules in question, this court has observed a well-marked line of distinction between broad, general titles on the one hand and narrow, restricted titles on the other. The legislature may, if it chooses, adopt a very broad and comprehensive title in a bill, in which case great liberality will be indulged to hold that any subject reasonably germane to such title may be embraced within the body of the bill. If, however, the legislature sees fit to use a restricted title, in which the language is of specific, rather than generic, import, the title will not be regarded so liberally, and provisions of the bill not fairly embraced therein cannot be given force. This rule was concisely expressed in *Hacker v. Barnes,* 166 Wash. 558, 7 P. (2d) 607, 80 A. L. R. 1212, in the following language:

"In its decisions, this court has tended to uphold general titles to statutes, while closely scrutinizing specific or restricted titles. *Northern Cedar Co. v. French,* 131 Wash. 394, 230 Pac. 837; *National Assn. of Creditors v. Brown,* 147 Wash. 1, 264 Pac. 1005; *National Assn. of Creditors v. Pendleton,* 158 Wash. 137, 290 Pac. 987; *In re Hulet,* 159 Wash. 98, 292 Pac. 430."

Each of the following cases cited by appellant involved a broad, general title of a statute which was upheld as constitutional:

In *Northern Cedar Co. v. French,* 131 Wash. 394, 230 Pac. 837, *supra,* the words "agricultural products," used

in the title, were held to adequately express the subject "forestry products" in the body of the act.

In *Hemmi v. James*, 164 Wash. 170, 2 P. (2d) 750, the following title: " 'AN ACT to provide for township organizations, and prescribing the duties and fixing the compensation of township officers, . . .' " was considered sufficiently comprehensive to embrace a provision in the statute for the election of justices of the peace as township officers.

The case of *In re Peterson's Estate*, 182 Wash. 29, 45 P. (2d) 45, *supra*, involved a statute entitled: " 'AN ACT authorizing the incorporation of mutual savings banks, defining their powers and duties, . . .' " The title was held to be sufficient to embrace a provision for joint tenancies in mutual savings bank accounts.

On the other hand, in each of the following cases, a restrictive title was held to be unconstitutional:

*Potter v. Whatcom County*, 138 Wash. 571, 245 Pac. 11. There, the title of the challenged statute was worded: " 'AN ACT relating to townships and amending [certain sections] of Remington's Compiled Statutes.' " It was held that this language was not broad enough to embrace a provision placing bridges having a cost value in excess of three hundred dollars under the sole jurisdiction and control of the county, there being no mention of "counties, their duties or liabilities" in the title of the act.

*National Ass'n of Creditors v. Brown*, 147 Wash. 1, 264 Pac. 1005, involved a statute entitled " 'AN ACT relating to the venue of civil actions in justice courts.' " The act contained a provision to the effect that, if an action were prosecuted contrary to its requirements as to venue, " 'No jurisdiction over the defendant shall be acquired thereby, . . .' " This court held that such provision in the body of the statute was not adequately expressed in the title because, in the words of the opin-

ion, " 'Venue' and 'jurisdiction' are entirely distinct matters, and one does not embrace the other."

In *Slotemaker v. International Fruit & Produce Co.,* 156 Wash. 574, 287 Pac. 883, it was held that the title of a statute " 'providing for the release of sureties on official bonds and undertakings' " was too restrictive to embrace a provision for the release of sureties on bonds which commission merchants were required by statute to furnish for the protection of consignees.

Appellants do not attempt to distinguish *Petroleum Lease Properties Co. v. Huse,* 195 Wash. 254, 80 P. (2d) 774, *supra,* from the instant case. In fact, they tacitly concede that it is in point, but they maintain that we should disregard it because of the later case of *State ex rel. Port of Seattle v. Department of Public Service,* 1 Wn. (2d) 102, 95 P. (2d) 1007. The factual situation in that case was as follows:

An act had been passed at the 1933 session of the legislature (Laws of 1933, chapter 154, p. 554), giving the department of public service the right to control the rates charged by public storage warehouses. No mention was made of port districts in the act. It was amended by Laws of 1937, chapter 202, p. 981 (Rem. Rev. Stat. (Sup.), §§ 11569-1 to 11569-12 [P. C. §§ 7202-21 to 7202-32]), entitled:

"AN ACT relating to storage warehouses and warehousemen in any county of this state having a population of thirty thousand or more, defining the same, providing for payment of fees thereby, providing for the regulation and supervision thereof by the department of public service, . . ."

In the body of this amendatory act, the term "warehouseman" was defined as "any person operating any storage warehouse"; the word "person" was defined to include, *inter alia,* "port commissions and districts." Thus, the later statute did, by definition of terms,

enlarge the scope of the earlier act by bringing within its provisions port commissions and districts. However, the case is distinguishable from the *Petroleum Lease Properties* case in at least two substantial particulars. The title in the *Port of Seattle* case employed this comprehensive language: "AN ACT relating to storage warehouses and warehousemen . . ." Certainly, those terms were broad enough to embrace all storage warehouses whether they were operated by individuals, by private corporations, or by municipal corporations such as port districts. That this was recognized in that case, is indicated by the following quotation from the opinion:

"Applying the standard that we have adopted, it seems clear that the title to the 1937 act is *comprehensive in substance,* definitely calls attention to the subject matter contained in the act, and meets the constitutional requirements to which our attention has been directed." (Italics ours.)

Furthermore, the title of the amendatory act in the *Port of Seattle* case, by using the phrase "defining the same" following the words "storage warehouses and warehousemen," specifically called attention to the fact that these basic terms were defined in the body of the statute. The title involved in the *Petroleum Lease Properties* case gave no indication that the term "securities" was defined in the act.

■ In the case at bar, the title of the 1937 statute is not sufficiently broad and comprehensive to warrant inclusion within the subject matter of the act of "noncitizens . . . ineligible to citizenship by naturalization," such as native Filipinos. Moreover, as in the *Petroleum Lease Properties* case, the title of the amendatory law, by adopting a term defined in the earlier statute without giving any indication that its meaning has been changed and broadened by statutory

definition, actually, although inadvertently no doubt, tends to be misleading and deceptive. We, therefore, hold that, in so far as it attempts to bring native Filipino citizens of the Philippine Islands within the scope of its provisions, Laws of 1937, chapter 220, is unconstitutional.

In view of the conclusion we have reached, we consider it unnecessary to pass upon any of the other questions raised by the respondents relative to the validity of the 1937 statute.

The judgment of the superior court is reversed as to the respondent Seattle Filipino Community Clubhouse, a corporation, and is affirmed as to the respondent Pio De Cano.

ROBINSON, C. J., MAIN, BEALS, STEINERT, JEFFERS, BLAKE, and SIMPSON, JJ., concur.

MILLARD, J. (dissenting)—As I deem the title of the act sufficient, and as the opinion in this case received by me today (February 25, 1941) must be immediately, and is, released, as its filing must be expedited [I have not the time for a lengthy disagreeing opinion], I merely dissent.