71 P.3d 644 (2003)
149 Wash.2d 622
CITIZENS FOR RESPONSIBLE WILDLIFE MANAGEMENT, Fred Blauert, an individual, Karen Awrylo, an individual, Bruce Vandervort, an individual, Michael G. Thornily, Sr., an individual, Robert Rupar, an individual, and George Sovie, an individual, Petitioners,
v.
STATE of Washington, Respondent, and
Protect Pets and Wildlife, American Society for the Prevention of Cruelty to Animals, Doris Day Animal League, the Fund for Animals, the Humane Society of the United States, the International Fund for Animal Welfare, and the Progressive Animal Welfare Society, Intervenor-Respondents.
No. 72186-6.
Supreme Court of Washington, En Banc.
Argued November 19, 2002.
Decided June 19, 2003.
*647 Robert Kehoe, Seattle, for Petitioners.
Shawn Newman, Olympia, Jonathan Lovvorn, Washington, DC, Christine Gregoire, Attorney General, Amy MacKenzie, Neil Wise, James Pharris, Assistant Attorneys General, for Respondent.
Daniel Fazio, Olympia, Amicus Curiae on Behalf of Wa. State Farm Bureau. *645
*646 IRELAND, J.
Citizens for Responsible Wildlife Management, on direct review to this court, claim that Initiative 713 violates Washington Constitution article II, sections 19 and 37. Finding that appellants have not shown, beyond a reasonable doubt, that Initiative 713 violates the constitution, we affirm the superior court's denial of the summary judgment motion.

FACTS
Appellants, Citizens for Responsible Wildlife Management (Citizens), are a coalition of over 400 wildlife conservation, scientific, business, outdoor recreation, farming, timber, nuisance animal control, and wildlife management organizations and individuals who are opposed to Initiative 713 (I-713). Respondents are comprised of the State and defendant-intervenors, a coalition of public interest organizations that sponsored I-713 (Sponsors).
Voters passed I-713 by a 54.61 percent vote on November 7, 2000. The official ballot title reads: "Shall it be a gross misdemeanor to capture an animal with certain body-gripping traps, or to poison an animal with sodium fluoroacetate or sodium cyanide?" State of Washington Voters Pamphlet, General Election 8 (Nov. 7, 2000). Prior to I-713, real property owners and duly licensed recreational and commercial trappers were limited as to the types of traps they could use to trap wild animals by WAC 232-12-141. This section allowed the use of both padded and unpadded foot-hold traps and also provided requirements for padding thickness and jaw face width. See former WAC 232-12-141(4)(a)-(d) (2000). This section disallowed trapping with steel traps with teeth or serrated edges or with neck or body snares attached to a spring pole or other such device. Former WAC 232-12-141(e), (h). Kill traps had to be checked every 72 hours and animals caught in restraining traps had to be removed within 24 hours of capture. Former WAC 232-12-141(f), (g). I-713 references WAC 232-12-141 and Citizens do not contend that I-713 unconstitutionally changes that section's provisions. Even before I-713, sodium fluoroacetate *648 could not be legally used in Washington. Also, as to sodium cyanide, "Wildlife Services, a federal agency responsible for controlling predator damage to livestock, is the only entity authorized to use [that pesticide]. [Its] use is heavily regulated and must be coordinated with the landowner or management agency." Clerk's Papers (CP) at 206-07.
The initiative has now been codified in RCW 77.15.192-.198; the corresponding revised code section will be cited for relevant sections of the initiative throughout this opinion. I-713 basically outlaws the trapping or killing of any mammal with body-gripping traps, sodium fluoroacetate, or sodium cyanide. It is set out below.
77.15.192 Definitions. The definitions in this section apply throughout RCW 77.15.194 through 77.15.198.
(1) "Animal" means any nonhuman vertebrate.
(2) "Body-gripping trap" means a trap that grips an animal's body or body part. Body-gripping trap includes, but is not limited to, steel-jawed leghold traps, padded-jaw leghold traps, Conibear traps, neck snares, and nonstrangling foot snares. Cage and box traps, suitcase-type live beaver traps, and common rat and mouse traps are not considered body-gripping traps.
(3) "Person" means a human being and, where appropriate, a public or private corporation, an unincorporated association, a partnership, a government, or a governmental instrumentality.
(4) "Raw fur" means a pelt that has not been processed for purposes of retail sale.
(5) "Animal problem" means any animal that threatens or damages timber or private property or threatens or injures livestock or any other domestic animal.
77.15.194 Unlawful traps. (1) It is unlawful to use or authorize the use of any steel-jawed leghold trap, neck snare, or other body-gripping trap to capture any mammal for recreation or commerce in fur.
(2) It is unlawful to knowingly buy, sell, barter, or otherwise exchange, or offer to buy, sell, barter, or otherwise exchange the raw fur of a mammal or a mammal that has been trapped in this state with a steel-jawed leghold trap or any other body-gripping trap, whether or not pursuant to permit.
(3) It is unlawful to use or authorize the use of any steel-jawed leghold trap or any other body-gripping trap to capture any animal, except as provided in subsections (4) and (5) of this section.
(4) Nothing in this section prohibits the use of a Conibear trap in water, a padded leghold trap, or a nonstrangling type foot snare with a special permit granted by [the] director under (a) through (d) of this subsection. Issuance of the special permits shall be governed by rules adopted by the department and in accordance with the requirements of this section. Every person granted a special permit to use a trap or device listed in this subsection shall check the trap or device at least every twenty-four hours.
(a) Nothing in this section prohibits the director, in consultation with the department of social and health services or the United States department of health and human services from granting a permit to use traps listed in this subsection for the purpose of protecting people from threats to their health and safety.
(b) Nothing in this section prohibits the director from granting a special permit to use traps listed in this subsection to a person who applies for such a permit in writing, and who establishes that there exists on a property an animal problem that has not been and cannot be reasonably abated by the use of nonlethal control tools, including but not limited to guard animals, electric fencing, or box and cage traps, or if such nonlethal means cannot be reasonably applied. Upon making a finding in writing that the animal problem has not been and cannot be reasonably abated by nonlethal control tools or if the tools cannot be reasonably applied, the director may authorize the use, setting, placing, or maintenance of the traps for a period not to exceed thirty days.
(c) Nothing in this section prohibits the director from granting a special permit to *649 department employees or agents to use traps listed in this subsection where the use of the traps is the only practical means of protecting threatened or endangered species as designated under RCW 77.08.010.
(d) Nothing in this section prohibits the director from issuing a permit to use traps listed in this subsection, excluding Conibear traps, for the conduct of legitimate wildlife research.
(5) Nothing in this section prohibits the United States fish and wildlife service, its employees or agents, from using a trap listed in subsection (4) of this section where the fish and wildlife service determines, in consultation with the director, that the use of such traps is necessary to protect species listed as threatened or endangered under the federal endangered species act (16 U.S.C. Sec. 1531 et seq.).
77.15.196 Unlawful poison. It is unlawful to poison or attempt to poison any animal using sodium fluoroacetate, also known as compound 1080, or sodium cyanide.
77.15.198 Violation of RCW 77.15.194 or 77.15.196 Penalty. Any person who violates RCW 77.15.194 or 77.15.196 is guilty of a gross misdemeanor.
RCW 77.15.192-.198.

PROCEDURAL HISTORY
In February 2001, Citizens filed an amended complaint seeking declaratory judgment that I-713 violated the Washington Constitution and an injunction barring enforcement of any portion of the initiative. Sponsors intervened on the State's behalf and cross-motioned for summary judgment. The superior court denied Citizens' motion for summary judgment and granted defendants' cross-motion. Citizens appealed; this court granted direct review.

ANALYSIS
Issue
Whether Initiative 713 violates article II, sections 19 and 37 of the Washington Constitution.
Standard of Review
This is an appeal from a summary judgment which is properly granted where there are no material issues of fact and the moving party is entitled to judgment as a matter of law. CR 56(c). When reviewing an order of summary judgment, the appellate court engages in the same inquiry as the trial court. Wilson v. Steinbach, 98 Wash.2d 434, 437, 656 P.2d 1030 (1982). The court should grant the motion only if, from all the evidence, reasonable persons could reach but one conclusion. Id. Construction of a statute is a question of law which is reviewed de novo. State v. Ammons, 136 Wash.2d 453, 456, 963 P.2d 812 (1998).
Argument Raised by Amicus
Amicus Curiae Washington State Farm Bureau raises several novel arguments that Citizens did not. However, those arguments will not be discussed as we will not address arguments raised only by amicus. See Sundquist Homes, Inc. v. Snohomish County Pub. Util. Dist. No. 1, 140 Wash.2d 403, 413, 997 P.2d 915 (2000).
Degree of Deference Given Initiatives
Citizens contend that initiatives should be given less deference than legislatively enacted bills, when reviewing for constitutional infirmities, because initiatives result from a "closed process" where "the initiative proponents are comprised of a small group of people." Br. of Appellant at 8. In support, they cite Wash. Fed'n of State Employees v. State, 127 Wash.2d 544, 573, 901 P.2d 1028 (1995). However, the portion of Wash. Fed'n cited to by Citizens appears in Justice Talmadge's concurrence/dissent, not in the majority. Further, the majority opinion does not suggest the argument Citizens now proffer. This court was clear in Amalgamated Transit Union Local 587 v. State that statutes enacted through the initiative process must be shown to be unconstitutional beyond a reasonable doubt; they are not reviewed under more or less scrutiny than legislatively enacted bills. Amalgamated Transit Union Local 587 v. State, 142 Wash.2d 183, *650 205, 11 P.3d 762 (2000); 27 P.3d 608 (and cases cited therein). Any reasonable doubts are resolved in favor of constitutionality. Wash. Fed'n, 127 Wash.2d at 556, 901 P.2d 1028. Citizens must meet the same burden in proving I 713's unconstitutionality as they would for any other statute.
Article II, section 19
Citizens first claim that the title of I-713 violates Washington Constitution, article II, section 19, which provides that "[n]o bill shall embrace more than one subject, and that shall be expressed in the title." It thus contains two prohibitions: (1) no bill shall embrace more than one subject (single subject rule), and (2) that subject shall be expressed in the title of the bill (subject in title rule). State ex rel. Wash. Toll Bridge Auth. v. Yelle, 32 Wash.2d 13, 23, 200 P.2d 467 (1948).
A. Single Subject Rule
The initial question is whether the legislative title or the ballot title is the relevant title. The ballot title is the relevant title where an initiative is voted on by the people, since it is the ballot title with which the voters are faced when voting. Wash. Fed'n, 127 Wash.2d at 555, 901 P.2d 1028 (also noting that not all initiatives have legislative titles). "Under Const. art. II, § 19, the title is construed with reference to the language used in the title. Moreover, a court examines the body of the act to determine whether the title reflects the subject matter of the act." Id. at 556, 901 P.2d 1028 (citation omitted). Section 19 is violated, and logrolling occurs, when the measure is drafted such that voters may be required to vote for something of which the voter disapproves in order to obtain approval of an unrelated law. Amalgamated, 142 Wash.2d at 212, 11 P.3d 762.
The official ballot title of I-713 reads: "Shall it be a gross misdemeanor to capture an animal with certain body-gripping traps, or to poison an animal with sodium fluoroacetate or sodium cyanide?" State of Washington Voters Pamphlet General Election 8 (Nov. 7, 2000).
1. Is the Title of I-713 General or Restrictive?
Article II, section 19 is not violated even if a general subject contains several incidental subjects or subdivisions. Amalgamated, 142 Wash.2d at 207, 11 P.3d 762. "A general title is one which is broad rather than narrow." Id. In assessing whether a title is general, it is not necessary that the title contain a general statement of the subject of an act; a few well-chosen words, suggestive of the general subject stated, is all that is necessary. Id. at 209, 11 P.3d 762. Where the title is general, "any subject reasonably germane to such title may be embraced within the body of the bill." De Cano v. State, 7 Wash.2d 613, 627, 110 P.2d 627 (1941). General titles are given a liberal construction and "no elaborate statement of the subject of the act is necessary." State ex rel. Wash. Toll Bridge Auth., 32 Wash.2d at 26, 200 P.2d 467.
A restrictive title "`is one where a particular part or branch of a subject is carved out and selected as the subject of the legislation.'" State v. Broadaway, 133 Wash.2d 118, 127, 942 P.2d 363 (1997) (quoting Gruen v. State Tax Comm'n, 35 Wash.2d 1, 23, 211 P.2d 651 (1949), overruled on other grounds by State ex rel. State Fin. Comm. v. Martin, 62 Wash.2d 645, 384 P.2d 833 (1963)). "`A restrictive title expressly limits the scope of the act to that expressed in the title.'" Amalgamated, 142 Wash.2d at 210, 11 P.3d 762 (quoting Broadaway, 133 Wash.2d at 127, 942 P.2d 363). In general, violations of the single-subject rule are more readily found where a restrictive title is used. Id. at 211, 942 P.2d 363. Restrictive titles are not given the same liberal construction as general titles and "provisions which are not fairly within such restricted title will not be given force." State ex rel. Wash. Toll Bridge Auth., 32 Wash.2d at 26, 200 P.2d 467.
Examples of restrictive titles were compiled in Amalgamated, 142 Wash.2d at 210-11, 11 P.3d 762: "Shall criminals who are convicted of `most serious offenses' on three occasions be sentenced to life in prison without parole?" (State v. Thorne, 129 Wash.2d *651 736, 757, 921 P.2d 514 (1996)); "`An act relating to the acquisition of property by public agencies....'" (Daviscourt v. Peistrup, 40 Wash.App. 433, 437, 698 P.2d 1093 (1985) (quoting Laws of 1971, 1st Ex.Sess., ch. 39)); "AN ACT relating to the rights and disabilities of aliens with respect to land...." (DeCano, 7 Wash.2d at 623, 110 P.2d 627). These examples indicate that restrictive titles tend to deal with issues that are subsets of an overarching subject. Thus, "[s]hall criminals who are convicted of `most serious offenses' on three occasions be sentenced to life in prison without parole?" is aimed at a subset issue (three-time "most serious offense" offenders) of an overarching subject (criminal offenders generally).
General titles were also compiled: "`A[n] A[ct] [r]elating to violence prevention.'" (In re Boot, 130 Wash.2d 553, 566, 925 P.2d 964 (1996) (quoting Laws of 1994, 1st Spec. Sess., ch. 7, § 101)); "`A[n] A[ct] [r]elating to the amendment or repeal of statutes superseded by court rule.'" (State v. Howard, 106 Wash.2d 39, 45, 722 P.2d 783 (1985) (quoting Laws of 1984, ch. 761)); "Shall campaign contributions be limited; public funding of state and local campaigns be prohibited; and campaign related activities be restricted?" (Wash. Fed'n, 127 Wash.2d at 555, 557, 901 P.2d 1028); "`AN ACT to provide an Insurance Code for the State of Washington; to regulate insurance companies and the insurance business; to provide for an Insurance Commissioner; to establish the office of State Fire Marshall; to provide penalties for the violation of the provisions of this act....'" (Kueckelhan v. Fed. Old Line Ins. Co., 69 Wash.2d 392, 402, 418 P.2d 443 (1966) (quoting Laws of 1947, ch. 79, at 189)). Amalgamated, 142 Wash.2d at 208, 11 P.3d 762.
The title of I-695, at issue in Amalgamated, was "[s]hall voter approval be required for any tax increase, license tab fees be $30 per year for motor vehicles, and existing vehicle taxes be repealed." It was held to be general, even though it "seem[ed] in part restrictive, i.e., the part which says ... [s]hall ... license tab fees be $30 per year for motor vehicles." 142 Wash.2d at 193, 216, 11 P.3d 762. This court explained that "the balance of the title broaden[ed] its scope." Id. at 216-17, 11 P.3d 762. Likewise, the title involved in City of Burien v. Kiga, "[s]hall certain 1999 tax and fee increases be nullified, vehicles exempted from property taxes, and property tax increases (except new construction) limited to 2% annually," was held to be general, even though there were portions of the title that appeared to be restrictive, because this court perceived that the title broadly dealt with the topic of tax relief. City of Burien v. Kiga, 144 Wash.2d 819, 825, 31 P.3d 659 (2001).
Citizens argue that the title is restrictive and violates section 19 because it impermissibly contains two subjects, trapping with body-gripping traps and killing with poisons. The State and Sponsors argue that the title addresses the single subject of humane treatment of animals, that the title is therefore general, and they respond that the title does not impermissibly deal with two subjects, as Citizens contend. The State and Sponsors maintain that the title embraces incidental subjects, trapping and pesticide use. Recall the title of I-713: "Shall it be a gross misdemeanor to capture an animal with certain body-gripping traps, or to poison an animal with sodium fluoroacetate or sodium cyanide?"
If the title of the bill is restrictive, provisions which are not fairly within such restricted title will not be given force. If the title is general, the subject of the legislation must be accurately expressed in the title of the act and the provisions of the enactment must be connected by a rational unity. See Amalgamated., 142 Wash.2d at 209, 11 P.3d 762. While the State and Sponsors advocate that the subject expressed in I-713's title is the humane treatment of animals, that description seems too expansive given that the title says nothing about that. Yet, to say the subject is narrow because the title mentions body-gripping traps and two pesticides implies that those types of traps and pesticides are a minute subset of other legal types of traps and pesticides. Such a characterization also implies there are myriad other traps or pesticides that are typically used. But portions of the act indicate that body-gripping traps are the type most often *652 used and that there are few available alternatives to their use. For example, the act targets any trap that grips the body of an animal in some way. See RCW 77.15.192(2) (definition of "`[b]ody-gripping trap'... includes, but is not limited to, steel-jawed leghold traps, padded-jaw leghold traps, Conibear traps, neck snares, and nonstrangling foot snares. Cage and box traps, suitcase-type live beaver traps, and common rat and mouse traps are not considered body-gripping traps"). Thus, it appears that the title of I-713 addresses a broader subject than Citizens perceive.
A more moderate interpretation, as compared to those offered by the parties, is that the title deals with banning methods of trapping and killing animals. Using the above quoted examples of general and restrictive titles to guide the determination here, I-713's title is general. I-713's title contains specific topics as well, namely, body-gripping traps and pesticides. As in Amalgamated, however, those topics are merely incidental to the general topic reflected in the title a ban on methods of trapping and killing animals. The title for I-713 is most accurately described as general and does not contain two subjects.
However, even if we assume, arguendo, that the title is restrictive, it is still a constitutionally valid title. The subjects of trap and pesticide use for animals are related so as not to be the individual, disjointed subjects that Citizens contend they are. The provisions in the initiative governing the types of traps and pesticides that may be used are fairly within the subject expressed in the title.
2. Rational Unity
We employ the "rational unity" analysis, having determined that I-713's title is general rather than restrictive. The first step is to determine whether there is a "`rational unity' between the general subject and the incidental subdivisions." Kueckelhan, 69 Wash.2d at 403, 418 P.2d 443. The rational unity analysis focuses solely on the measure itself, not statements in the voters pamphlet. Amalgamated, 142 Wash.2d at 212, 11 P.3d 762. Here, the incidental subjects with which the initiative deals are body-gripping traps and two pesticides. It is logical to conclude that both body-gripping traps and pesticides each bear a rational relationship to the general subject of I-713the regulation of methods for trapping and killing animals.
The second step in the rational unity analysis is to determine if the incidental subjects bear some rational relation to one another. See City of Burien, 144 Wash.2d at 826, 31 P.3d 659; Amalgamated, 142 Wash.2d at 216, 11 P.3d 762. Citizens claim that the "test for determining whether the dual subjects of an initiative satisfy art. II, § 19's `rational unity' requirement as articulated by the Court in Amalgamated Transit and City of Burien is: `Does rational unity exist between the two subjects such that they might be considered necessary to implement the other?'" Appellants' Reply Br. at 16 (citing Amalgamated, 142 Wash.2d at 217, 11 P.3d 762; City of Burien, 144 Wash.2d at 827, 31 P.3d 659). Citizens argue that there is no rational unity between banning body-gripping traps and the use of the pesticides because "it is completely unnecessary to ban traps in order to implement the ban on the use of these chemical compounds as pesticides." Br. of Appellant at 32 (emphasis omitted). They claim that the initiative "manifests the evils" of logrolling, presumably by forcing voters to vote, in combination, on whether to ban certain traps as well as the pesticides. Br. of Appellant at 32.
In Amalgamated, this court identified that I 695 had two purposes: "to specifically set license tab fees at $30 and to provide a continuing method of approving all future tax increases." Amalgamated, 142 Wash.2d at 217, 11 P.3d 762. In City of Burien, the incidental subjects were nullification of tax increases and one time refund and a change in the method of assessing property taxes. City of Burien, 144 Wash.2d at 827, 31 P.3d 659; see also Wash. Toll Bridge Auth. v. State, 49 Wash.2d 520, 524, 304 P.2d 676 (1956) (title violated single subject rule because incidental subjects were unrelated and not germane to one another). In those cases, the subjects were so disjointed as to bear no relation to each other, thus the court's conclusion that they were unrelated because neither *653 was necessary to implement the other. Of particular relevance, the initiatives in Amalgamated, City of Burien, and Washington Toll Bridge Authority each contained dual subjects, but one was more broad, long term and continuing than the other, a characteristic that suggests logrolling may be at issue. See Amalgamated, 142 Wash.2d at 217, 11 P.3d 762; City of Burien, 144 Wash.2d at 827, 31 P.3d 659; Wash. Toll Bridge Auth. v. State, 49 Wash.2d at 524, 304 P.2d 676.
Citizens misconstrue the analysis in Amalgamated. The language upon which Citizens deduce their "test" reads as follows:
Here, while the title of I-695 seems in part restrictive, i.e., the part which says that "[s]hall ... license tab fees be $30 per year for motor vehicles[,]" the balance of the title broadens its scope, similarly to the title in Wash. Toll Bridge Auth. v. State. We conclude that I-695 has a general title. However there is no rational unity between the subjects of I-695. Similar to the act in Wash. Toll Bridge Auth. v. State, I-695 also has two purposes: to specifically set license tab fees at $30 and to provide a continuing method of approving all future tax increases. Further, neither subject is necessary to implement the other. I-695 violates the single-subject requirement of article II, section 19 because both its title and the body of the act include two subjects: repeal of the MVET and a voter approval requirement for taxes.
Amalgamated, 142 Wash.2d at 216-17, 11 P.3d 762 (emphasis added). Interestingly, this court, in both Amalgamated and City of Burien upon which Citizens rely for their "test" of rational unity, clearly expressed what has long been the true test of rational unity: "the existence of rational unity or not is determined by whether the matters within the body of the initiative are germane to the general title and whether they are germane to one another." City of Burien, 144 Wash.2d at 826, 31 P.3d 659; Amalgamated, 142 Wash.2d at 209-10, 11 P.3d 762. An analysis of whether the incidental subjects are germane to one another does not necessitate a conclusion that they are necessary to implement each other, although that may be one way to do so. This court has not narrowed the test of rational unity to the degree claimed by Citizens. It is more likely that the statements made in Amalgamated and City of Burien in regard to the dual subjects being unnecessary to implement the other were made to further illustrate how unrelated the two were. Moreover, the instant title does not contain two subjects, where one is more broad and long term than the other. I-713's title therefore does not manifest the dangers of logrolling as did those in Amalgamated and City of Burien.
Citizens go on to argue that the subject of I-713 is the use of traps used for recreation and commerce in fur and that the use of sodium cyanide and sodium fluoroacetate is not germane to this subject because these pesticides were already illegal in Washington when the initiative was put to voters. Citizens rely on testimony given after enactment of the initiative at a senate hearing. Section 19 analysis is limited to the title and body of the act. See Amalgamated, 142 Wash.2d at 212, 11 P.3d 762. The testimony on which Citizens relies is not relevant.
In this case, I-713 embraces the general subject of banning particular methods of trapping and killing mammals. It also contains two incidental subjects: trapping with body-gripping traps and killing with two particular pesticides. These two subjects are germane to both the general subject and to each other.
B. Subject in Title Rule
The second requirement of section 19 is that the subject of the act must be expressed in its title. Amalgamated, 142 Wash.2d at 217, 11 P.3d 762. The purpose of this provision is to ensure legislators and the public are on notice as to what the contents of the bill are. Id. This requirement has particular importance in the context of initiatives since voters will often make their decision based on the title of the act alone, without ever reading the body of it. Id. A title complies with this requirement if it gives notice to voters which would lead to an inquiry into the body of the act or indicates the scope and purpose of the law to an inquiring mind. Id. But the title need not be an index *654 to the contents, nor must it provide details of the measure. Id.
Citizens contend that I-713 violates this requirement because the title does not mention the ban on raw fur trade of animal pelts obtained with body-gripping traps and the two pesticides. The State and Sponsors counter that the title indicates restrictions on the methods of trapping and killing of animals and that attendant restrictions on the fur trade naturally flow from the subject expressed in the title. They further contend that the title gives notice that would lead to an inquiry into the body of the act, where the restrictions on the trade of raw fur would be readily apparent.
The title makes it a crime to employ body-gripping traps and gives no indication of limitations on that ban. It would be illogical for the average voter to assume the raw fur trade of pelts obtained illegally would be permitted. Moreover, given the subject expressed in the titlea ban on certain methods of trapping or killing animalsthat trapping methods used in the fur trade would be affected is not unreasonable. In this case, I-713's title must indicate to the average voter that the body of the bill has to do with methods of trapping and killing animals. I-713's title conveys exactly that. Accordingly, whether general or restrictive, the title of I-713 does not violate the single subject rule or the subject in title rule of article II, section 19.
Article II, section 37
Article II, section 37 provides that "[n]o act shall ever be revised or amended by mere reference to its title, but the act revised or the section amended shall be set forth at full length." The purpose of section 37 is to "protect the members of the legislature and the public against fraud and deception; not to trammel or hamper the legislature in the enactment of laws." Spokane Grain & Fuel Co. v. Lyttaker, 59 Wash. 76, 82, 109 P. 316 (1910). An act is exempt from section 37 requirements if the act is complete, independent of prior acts, and stands alone on the particular subject of which it treats. Amalgamated, 142 Wash.2d at 246, 11 P.3d 762. "Nearly every legislative act of a general nature changes or modifies some existing statute, either directly or by implication" but this, alone, does not inexorably violate the purposes of section 37. Holzman v. City of Spokane, 91 Wash. 418, 426, 157 P. 1086 (1916). "Undoubtedly, modification of existing laws by a complete statute renders the existing law by itself `erroneous' in a certain sense." Wash. Educ. Ass'n v. State, 97 Wash.2d 899, 906, 652 P.2d 1347 (1982). Only that part of an act that violates section 37 will be invalidated, provided there is a severability clause. See Amalgamated, 142 Wash.2d at 256, 11 P.3d 762.
A. Is I-713 Amendatory of Prior Acts or Complete?
An act is amendatory in character, rather than complete, if it changes the scope or effect of a prior statute, and therefore must comply with section 37. State ex rel. Arnold v. Mitchell, 55 Wash. 513, 518, 104 P. 791 (1909). This court, in Wash. Educ. Ass'n, compiled a two-part test for violation of section 37. Wash. Educ. Ass'n, 97 Wash.2d at 903, 652 P.2d 1347. First, the court must determine whether the bill is such a complete act that the scope of the rights created or affected by the bill can be ascertained without referring to any other statute or enactment. Id. Second, would a determination of the scope of the rights under the existing statutes be made erroneous by the bill? Id.
Qualifications of that two-part test have subsequently been made. This court, in Amalgamated, cautioned against too broad of an analysis for section 37 violation and clarified that "[a] later enactment which is a complete act may very well change prior acts and [yet still be] exempt from the requirement of article II, section 37." Amalgamated, 142 Wash.2d at 251-52, 11 P.3d 762. The Amalgamated court held that "[section 37] does not apply in all cases where a new act, in effect, amends another[.] [W]here the new law is independent, and no further search is required to know the law which the new act covers, the new act does not come within [section 37]." Id. at 252, 11 P.3d 762. Regarding the second prong of the test for section 37 violation, Amalgamated explained *655 that the question asked in that prong cannot be answered in isolation because complete acts may well result in a reader of an existing statute being unaware there is new law on the subject. Id. at 253, 11 P.3d 762. Therefore, it is not enough to ask whether one reading an existing statute would be unaware that a new enactment changes it. Id. Complete acts which (1) repeal prior acts or sections thereof on the same subject, (2) adopt by reference provisions of prior acts, (3) supplement prior acts or sections thereof without repealing them, or (4) incidentally or impliedly amend prior acts, are excepted from section 37. Naccarato v. Sullivan, 46 Wash.2d 67, 75, 278 P.2d 641 (1955).
Citizens contend that I-713 is not a complete act because the effect of the initiative is not readily ascertainable as it alters the rights of landowners, conferred by RCW 77.36.030, to trap or kill wildlife causing damage without reference to that statute. This, Citizens urge, is directly contrary to the purpose behind section 37 which is to "avoid confusion, ambiguity and uncertainty in the statutory law through the existence of separate and disconnected legislative provisions, original and amendatory, scattered through different volumes or different provisions of the same volume." Br. of Appellant at 9 (quoting Amalgamated, 142 Wash.2d at 245, 11 P.3d 762). Arguing that I-713 is not complete in itself as it does not stand alone on the subject of using traps on private property to control animal predation, Citizens conclude I-713 violates section 37.
Under the first prong of the test, the effect of I-713 is readily ascertainable from the words of the statute alone. By its own terms, I-713 clearly bans the use of body-gripping traps to trap any animal for recreation or commerce in fur, or for any other purpose without engaging the special permit process provided. See RCW 77.15.194. Its effect on WAC 232-12-141 is not at issue in this appeal. The first prong of the test is satisfied, i.e., the scope of the rights created or affected by I-713 can be ascertained without referring to any other statute or enactment.
As to the second prong, Citizens vie for a strict interpretation of section 37 and its requirements, contending that I-713 fails because it does not set forth statutes that it amends. In so doing, Citizens do not argue their point in light of the second prong of the section 37 test as put forth in Amalgamated, above. Instead, they argue that I-713 creates ambiguity as to RCW 77.36.030 in three ways, leaving a landowner who reads RCW 77.36.030 unaware of what his rights are regarding trapping problem animals.
The first alleged ambiguity that Citizens argue renders rights conferred by RCW 77.36.030 erroneous is that a landowner whose crops are being damaged by wildlife would not know whether he must obtain a special permit from Washington Department of Fish and Wildlife (WDFW), as provided in I-713, or whether he may trap without a license as authorized by RCW 77.36.030. RCW 77.36.030(1) provides that a landowner may trap wildlife causing damage to crops without a license. I-713 provides that WDFW may issue a special permit if the landowner explains, in writing, that an "animal problem" exists. RCW 77.15.194(4)(b). In turn, "animal problem" includes any animal damaging timber, private property, livestock, or domestic animals. RCW 77.15.192(5). Citizens question whether I-713's criteria for an "animal problem" encompass damage to crops or fowl. On this issue, it seems likely that damage to crops would be considered an animal problem as that would be damage to private property. I-713 does not change a landowner's right to trap; it regulates the types of traps that may be used. In this way, the initiative does not alter preexisting rights or duties to an impermissible degree.
Citizens next point out that RCW 77.36.030(1)(c) confers the authority to private cattle ranchers to trap animals causing damage if WDFW fails to respond to a complaint within 48 hours. There is no corresponding provision in I-713. Citizens argue that a rancher would be left wondering whether this authority still exists under I-713. Again, I-713 addresses the types of traps and pesticides that may be used. A cattle rancher may trap problem animals with any type of nonbody-gripping traps without obtaining a special permit. Recall *656 that modification of an existing law by a new act renders the existing law erroneous in a certain sense. Wash. Educ. Ass'n, 97 Wash.2d at 906, 652 P.2d 1347. In Washington Education Association, this court upheld a new law against a section 37 challenge, stating that "[t]he purpose of SHB 782 is not hidden and, to the extent it fails to articulate how it relates to the rest of RCW 28B.50, its infirmities are not of constitutional magnitude." Id. This is analogous to the change I-713 makes to the licensing requirements of landowners and we find that that change is not of constitutional magnitude.
Taking a different tack, Sponsors argue that section 37 is not implicated in this case because I-713 does not purport to amend anything by reference to its title. They allege that landowners may still kill damagecausing wildlife. I-713 "merely imposes restrictions on the use of certain dangerous methods to achieve this result." Intervenor-Resp't's Br. at 14-15. As Sponsors correctly and persuasively emphasize, while RCW 77.36.030 goes to whether problem animals may be killed or trapped at all, I-713 imposes incidental restrictions on the manner in which they may be killed or trapped. As such, we hold that RCW 77.36.030 and I-713 are not aimed at the same subjects and, thus, I-713 stands alone on the particular subject of which it treats and therefore does not violate section 37.

CONCLUSION
Article II, section 19 requires that bills may contain only one subject and that that subject be expressed in its title. I-713 can most fairly be said to address methods of trapping and killing animals. Its title clearly bans the use of body-gripping traps as well as the use of sodium fluoroacetate and sodium cyanide to poison any animal. Since particular types of traps and pesticide use cleanly falls within the auspices of methods of trapping and killing animals, the single subject and the subject expressed in the title rules have not been violated. Article II, section 37 requires that an act amending or revising a prior act may not reference the prior act by its title but must, instead, set it forth at full length. I-713 passes the first prong of section 37 analysis since the scope of the rights created or affected by I-713 can be ascertained without referring to any other statute or enactment. As to the second prong of section 37 analysis, I-713 does not render existing rights erroneous. I-713 does not violate article II, section 37. Citizens have failed to show I-713 unconstitutional beyond a reasonable doubt.
We affirm the trial court's grant of summary judgment in favor of the State and Sponsors upholding I-713 as constitutional.
ALEXANDER, C.J., JOHNSON, MADSEN, BRIDGE, CHAMBERS, OWENS, JJ., THOMPSON, J. Pro Tem.
SANDERS, J., dissenting.
I believe the majority's disposition of this constitutional challenge is inconsistent with our recent holding in Amalgamated Transit Union Local 587 v. State, 142 Wash.2d 183, 11 P.3d 762 (2000); 27 P.3d 608.
Amalgamated, like the case at bar, addressed the constitutional challenge that Initiative 695 (I-695) violated Washington Constitution article II, section 19 which provides: "No bill shall embrace more than one subject, and that shall be expressed in the title."
The majority here (and I agree) thus perceives two constitutional prohibitions: "(1) no bill shall embrace more than one subject (single subject rule), and (2) that subject shall be expressed in the title of the bill (subject in title rule)." Majority at 650.
The ballot title at issue in Amalgamated was: "`Shall voter approval be required for any tax increase, license tab fees be $30 per year for motor vehicles, and existing vehicle taxes be repealed.'" 142 Wash.2d at 193, 11 P.3d 762 (quoting State of Washington Voters Pamphlet, General Election 4 (Nov. 2, 1999)). Proponents of I-695 claimed the initiative embraced but a single subject, limiting taxes; whereas the opponents claimed there was a double subject, one pertaining to taxes and one pertaining to fees, notwithstanding the initiative's definition of taxes which included fees.
In Amalgamated a majority of the court concluded I-695 had a general title; "[h]owever, *657 there is no rational unity between the subjects of I-695." 142 Wash.2d at 217, 11 P.3d 762. The majority reasoned that rational unity was absent not only because license fees were limited and a continuing method for approving all future tax increases was imposed but "[f]urther, neither subject is necessary to implement the other." Id. at 217, 11 P.3d 762.
Thus, in its holding, Amalgamated rejected the claim that limitation of license fees and restraints on new taxation were components of a more general scheme to limit taxes, favoring a more exacting approach that the two components lacked "rational unity" because "neither subject is necessary to implement the other."
Of course Initiative 713 has several different components which include the prohibition against use of certain body-gripping traps and the prohibition against use of certain poisons. Additionally, trading in raw animal fur obtained with body-gripping traps is also prohibited, even when the animal was lawfully trapped by special permit. The first two components are mentioned in the title however the last component is not. Therefore if each of these components is a single subject then both prongs of article I, section 19 would be violated because (1) the initiative as a whole embraces more than a single subject and (2) the title does not adequately disclose the subject.
The majority in an attempt to reconcile its result with Amalgamated simply reads out the "neither subject is necessary to implement the other" language of Amalgamated, 142 Wash.2d at 217, 11 P.3d 762, and then ignores the ultimate holding of that case which rests its result on precisely that necessary implementation distinction. Majority at 653.
Although Amalgamated has itself been criticized for failure to articulate understandable rationale for distinguishing between component parts of legislation which do or do not have "rational unity" with one another,[1] today's majority seems to jettison the perhaps wrong, but at least understandable, criteria that rational unity is not achieved when the component parts are not "necessary to implement" one another.
Therefore what remains in the present majority opinion is an ad hoc decision which gives even less guidance as to what may or may not violate the single subject rule, or subject in title rule, than previously existed. In practice it allows the court to justify any conclusion it wants by eschewing principle and predictability.
For these reasons I dissent.
NOTES
[1] See James Bond, The Initiative Process: The Supreme Court Versus the People, 56 Wash. St. B. News, June 2002, at 42.